WATSON et al. v. NATIONAL LIFE & TRUST CO. et al.

(Circuit Court of Appeals, Eighth Circuit. August 12, 1911.)

No. 3,485.

**1. INSURANCE (§ 47\*)—REINSURANCE—VALIDITY OF CONTRACTS.**

A life insurance company organized under the laws of a state, which had taken over the business and assumed the contracts of a federal corporation having the same name, was not chargeable with inducing policy holders to assent to the transfer by fraud because of a statement made to them in a circular that it was a reincorporation of the old company where, although it might not have been such in a legal sense, the statement was true for all practical purposes; the new company having the same stock, stockholders, officers, assets, and offices as the old.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 47.\*]

**2. INSURANCE (§ 47\*)—LIFE INSURANCE—REINSURANCE—RIGHTS OF POLICY HOLDERS—ELECTION.**

A life insurance company cannot transfer its policy holders to another company without their consent; but, if such transfer is attempted, a policy holder must elect whether he will treat it as an abandonment of the contract and sue to recover the amount then due him, continue to pay premiums under protest, and keep alive his claim against the original insurer, or acquiesce in the transfer, and if, in the absence of fraud, he accepts the assumption certificate and continues to pay to the new insurer without objection, he cannot thereafter maintain a suit based on a repudiation of the new contract.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 47.\*]

**3. EQUITY (§ 423\*)—RIGHT TO RELIEF—SUIT BY REPRESENTATIVE OF CLASS.**

Where none of the complainants of record in a suit in equity are entitled to relief, the court cannot grant relief to unnamed persons on whose behalf, as well as the complainants, it is claimed the suit was brought.

[Ed. Note.—For other cases, see Equity, Dec. Dig. § 423.\*].

**4. INSURANCE (§ 50\*)—INSURANCE COMPANIES—RECEIVERSHIP.**

A large insurance company, while not a public corporation, is a public institution, and, where there is no apprehension as to its solvency, a court of equity will carefully consider all the facts before appointing a receiver for it or ordering an accounting at suit of individual policy holders.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 50.\*]

Appeal from the Circuit Court of the United States for the Southern District of Iowa.

Suit in equity by Alexander L. Watson and others against the Security Life & Savings Insurance Company, National Life & Trust Company, National Life Insurance Company of the United States of America, a federal corporation, and National Life Insurance Company of the United States of America, an Illinois corporation. Decree for defendants, and complainants appeal. Affirmed.

Wm. H. Atwood (E. R. Mason, on the brief), for appellants.

Maurice E. Locke (Locke & Locke, on the brief), for appellees.

Before ADAMS and SMITH, Circuit Judges, and AMIDON, District Judge.

---

SMITH, Circuit Judge. The defendant the Security Life & Savings Insurance Company, hereafter called the "Security Company," was organized under the laws of Iowa as a life insurance company in December, 1900, with a capital stock of $400,000, of which $100,000 was paid in cash and the balance represented by the notes of stockholders. Under the laws of Iowa the Auditor of State then had, and still has, supervision of insurance companies. Frank F. Merriam was at that time Auditor of State and a stockholder, director, and president of the Security Company and so remained during the entire period of its activity. It commenced business soon after its organization. Its business consisted of the sale of endowment policies under which it agreed if all premiums were paid when due throughout the endowment period to pay the beneficiary at the end of 10 years the full face of his policy and his equitable share then apportioned from the savings fund. It was provided that the savings fund referred to should include: First, all excess of the net interest earnings on the reserve fund; second, the entire reserve on policies lapsed through nonpayment of premiums; third, all interest collected for reinstatement of lapsed policies; fourth, the balance of the reserve to the credit of lapsed or surrendered policies forfeited under the loan privilege. Its policies also provided for certain mortuary benefits.

In March, 1899, the National Life & Trust Company, hereafter called the "Trust Company," was organized under the laws of Iowa as a life insurance company with a capital of $100,000, of which $25,000 was paid in cash and $75,000 was represented by the notes of the stockholders.

In May, 1900, by amendment of the articles of incorporation, the capital stock was increased to $200,000, and it was provided that the new stock should be paid for 25 per cent. in cash and 75 per cent. in stockholders' notes. What amount of this new issue of stock was taken does not clearly appear.

While organized as a life insurance company, the actual business of the company consisted in the sale of endowment bonds. These bonds were quite similar to the policies issued by the Security Company. Each bond was to mature in ten years from date, and the annual premium was 10 per cent. of the face. At maturity the company agreed to pay the face of the bond and its share of the "accumulated profits" consisting of the profits of the company accumulated from the following sources: First, interest earnings; second, forfeitures under lapsed bonds; third, mortality savings; fourth, profits that accrue by reason of policies surrendered under loan or surrender privileges; fifth, miscellaneous sources. These bonds, like the bonds of the Security Company, provided for mortuary benefits.

On July 25, 1868, Congress passed an act, to incorporate the National Life Insurance Company of the United States of America. Act July 25, 1868, c. 239, 15 Stat. 184. This act fixed the capital stock at $1,000,000 with leave to the stockholders to increase the same at pleasure. The act provided that the offices of the company should be located at Washington, District of Columbia, with leave to establish branch agencies elsewhere subject to the local laws. This company,

hereafter called the "Federal Company," transacted business from Washington for about 10 years, but in 1878 its charter and capital stock were acquired by parties in Chicago and its actual operative headquarters were removed to that city. Thereafter it did not actively seek new business until 1900, when its organization again changed and it actively re-entered the field for business.

In February, 1904, there was organized under the general law of Illinois the defendant the National Life Insurance Company of the United States of America, to be located at Chicago, Cook county, Ill., with a capital paid in cash of $1,000,000. It is hereafter called the "Illinois Company."

Under a contract of November 6, 1902, the Security Company transferred all its assets of every kind, except its stockholders' notes, for 75 per cent. of its capital, to the Trust Company, and in consideration thereof the Trust Company paid $92,000 and reinsured all the risks and assumed all the liabilities of the Security Company. This contract was approved by Frank F. Merriam, then Auditor of the State of Iowa, and stockholder, director, and president of the Security Company. May 12, 1903, the Federal Company reinsured all the risks and assumed all the liabilities of the Trust Company and took over all its assets including its capital stock but excluding the stockholders' notes for the portion of the capital not paid in. Upon the face of the contract the portion of the capital of the Trust Company which had been paid in cash was lost; but while the record is not clear it seems probable from it that this was paid by the Federal Company to stockholders of the Trust Company. About March 3, 1904, the Federal Company transferred all its assets to the Illinois Company except $1,000,000, the amount of its capital, and the Illinois Company reinsured all the risks and assumed all the liabilities of the Federal Company.

On March 1, 1902, the Security Company sold its policy, No. 1,682, to the plaintiff Fred A. Olson. The premium was $30 for the first year and $15 on the 1st of March and September during the balance of the 10-year period. He paid $30 to the Security Company at the issuance of his policy and $15 to the Trust Company about March 15, 1903. He paid no more to any one, is not a witness, and there is no explanation of why he quit paying.

The Trust Company, among many others, sold the following bonds:

October 1, 1902, No. 21,717, to the plaintiff Dr. Alexander L. Watson, a dentist of Galesburg, Ill. The first annual premium of $120 was paid, and thereafter it was paid in quarterly installments on the 1st of October, January, April, and July. He made nine of these quarterly payments, two to the Federal Company and seven to the Illinois Company.

April 1, 1903, No. 30,598, to intervener George Rodecker. Annual premium, $300. He paid the first installment to the Trust Company, the next two to the Federal Company, and five to the Illinois Company.

April 1, 1903, No. 17,336, to intervener Frank R. Conklin. Annual premium, $150. He made two payments to the Trust Company and six to the Illinois Company.

April 1, 1902, No. 17,337, to intervener Amelia M. Conklin. Annual premium, $150. She paid two installments to the Trust Company and six to the Illinois Company.

March 1, 1902, No. 16,400, to intervener Dennis E. Sullivan. Annual premium, $150. He paid two installments to the Trust Company and six to the Illinois Company.

January 1, 1901, No. 9,036, to intervener Russell T. Barr. Premium, $120 a year, payable, first annual premium down and thereafter in monthly installments of $10 each. After 18 months this was changed to quarterly installments of $30 each. He made 29 payments, 9 to the Trust Company, 3 to the Federal Company and 17 to the Illinois Company.

This suit was brought by Dr. Watson in the district court of Polk county, Iowa, against the Security Company, the Trust Company, the Federal Company, the Illinois Company, and B. F. Carroll, Auditor of State of Iowa.

The petition was filed January 20, 1906, and alleged that the action was brought on his own behalf and for such other bond and policy holders of defendants as might elect to join; that there were thousands of persons similarly situated and a number who desired to join, but that it was impossible to join them all and impracticable for each to prosecute separate suits. B. F. Carroll, Auditor of State, was never served and did not appear and has long since retired as Auditor of State and become Governor of Iowa, being succeeded as Auditor by J. L. Bleakly.

Upon application the case was removed to the Circuit Court of the United States for the Southern District of Iowa. In the Circuit Court the plaintiff filed an amended bill in which Fred A. Olson was joined as plaintiff, to which defendants demurred, and pending the hearing on demurrer George Rodecker, Frank R. Conklin, Amelia M. Conklin, Dennis E. Sullivan, and Russell T. Barr intervened, alleging that they held bonds as heretofore stated and joined, with some modifications, in the prayer of the plaintiffs for relief. Defendants also demurred to the bill of intervention, and the Circuit Court sustained the demurrers both to the amended bill and the bill of intervention. Upon appeal this ruling was reversed. Watson v. National Life & Trust Co., 162 Fed. 7, 88 C. C. A. 380. In the opinion on that appeal the amended bill and the bill of intervention are so fully set out that it is unnecessary to again do so here. After the reversal the defendants the Security Company, the Trust Company, the Federal Company and the Illinois Company filed their joint and several answers to which the complainants and interveners made replication. The cause was tried, and the Circuit Court in its decree found that the various transfers heretofore stated were with full and ample authority; that there was no fraud in any of said transfers or in the concealment thereof; that the Illinois Company is a solvent, going concern amply able to carry out its contracts executed and executory; and that the complainants and interveners each sustained contractual relations with the Illinois Company and with ample knowledge of the facts they acquiesced in the transfers, and it dismissed the bill of com-

plaint as amended and the bill of intervention and the complainants' and interveners' appeal.

On the brief of appellants Messrs. Atwood and Mason style themselves as solicitors for appellants and 134 other bondholders, but no one has come in and asked to be joined as a party herein except the two complainants and the five interveners.

It does appear in some cases by evidence and in others by unsworn statements that Bernard B. Smith, Christian Jensen, Anna K. Lindemeyer, Verna D. Horton, William H. S. Callender, and Lewis T. Hussey are in various ways supporting the complainants' contention. It appears that Mollie Ludwig, C. H. Wilson, and William Sipple were policy holders in the Security Company, and Clarence H. Martin, Anna Martin, and Clarence W. Martin were bondholders of the Trust Company.

Mr. Atwood stated, during the cross-examination of the witness Carter, that these six persons had also joined in this suit. Nothing more appears as to their claims, and as to the balance of the 134 nothing whatever appears.

The Security Company had issued 2,393 policies of which about 2,100 were in force at the time of the transfer to the Trust Company. The Trust Company had issued 30,061 bonds at the time of its transfer to the Federal Company, and of these many thousands only about 20 in any way appear to be complaining. It might well be inferred that the overwhelming majority of the policy holders and bondholders were not dissatisfied particularly, as it appears that the plaintiff Dr. Watson sent the following letter to those he was informed and believed to be holders or owners of bonds similar to his:

"Watson & Cabeen, Dentists.

"Galesburg, Ill., January 8, 1906.

"A Word to the Bond and Policy Holders of the Security Life and Savings Insurance Company, National Life and Trust Company and National Life Insurance Company, U. S. A.

"Brother Bondholders:

"While confidence in life insurance managers has been greatly shocked and shattered by developments in the New York investigations, nothing has been shown there which for pure rascality begins to compare with the systematic trafficking in companies and the combined assets of companies, to which you and I, as subscribers to the gold-brick bonds of the above companies, have been the victims, and have been obliged to submit. These companies, while at the summit of prosperity, with millions of assets received from us, have already sold out three times within two years, without cause or excuse, except speculation and graft for managers and stockholders, some of whom have become very wealthy, who only a few years ago were known as men without property, money or means. At this rate they have time for about ten more transfers before the bonds mature, and we have reason to believe negotiations have been pending for at least one more.

"The great wealth the officers now have, are the premiums paid to them by us bondholders, upon which they have agreed to make profits for us. It is now reasonably certain that they never intended to divide any profits with bondholders and that the bondholders who continue to pay tribute to those fellows, in the vain hope of even getting that money back, without any profit will be greviously disappointed; that such payments are simply gifts to said managers. I have good authority for saying, that unless all said companies and their assignees are now insolvent, that every bondholder, whose premiums are paid to May 12, 1902, or later, are entitled to recover all the money

they have paid, whether the same be one or more years, and having been encouraged to bring a suit, by many other bondholders offering to join therein. I have employed Wm. H. Atwood, of this city, an attorney of twenty-five years standing, who has given special attention to life insurance law, and have brought a suit in my own name, but for the benefit of myself and all other bondholders who will join. The suit is in Des Moines where the assets and a part of the defendants are, and all who desire to do so, can join on the same terms. A copy of agreement, which all will sign, is enclosed herewith. You can fill out the blanks, sign and mail it with your bond and receipts to Mr. Atwood, or to any bank here for him and a duplicate of the agreement signed by him will be returned to you, and your rights will be protected and enforced with as little delay as the forms of law will permit. Hoping that you will see your way clear to join with us and send in your bond, I remain,

"Very truly yours, [Signed.] Dr. A. L. Watson.

"For information in regard to Mr. Atwood, you are referred to Galesburg National Bank, Kellogg, Drake & Co., leading dry goods house, O. B. Judson Co., leading furniture house, all of this city."

The copy of contract referred to in these circular letters was as follows:

"Law Office of Wm. H. Atwood,
      "Suite 7, Mail Bldg..
          "Galesburg, Illinois.

"Collection Agreement.

"It is agreed between the parties hereto that National Life and Trust Co. bond No. ...... Dated ...... A. D. ...... for $...... on which $...... have been paid, is delivered to Wm. H. Atwood, attorney at law, to be joined with others in suit to recover the amount paid thereon.

"The original complainants have already advanced all necessary costs, have now a deposit in the hands of the clerk to provide for accruing costs, and under the rules of the court will be required to maintain a deposit for costs in the hands of the clerk during the pendency of said suit.

"All costs are recoverable from the defendants, but should all defendants prove insolvent, the pro rata for each bondholder to contribute should not exceed five dollars in any event.

"Said Atwood agrees, that after having joined said policy bond in said suit, he will not dismiss or settle as to it for any less sum than the amount paid thereon by said bondholder, and that he will make no charge for his services except the sum of 25 per cent. of amount actually recovered. Said bondholder reserves the right to settle personally with the defendants, and have his bond returned to him, by mailing said Atwood a copy of the settlement papers, signed by him or her with the particulars of such settlement, and by paying to said Atwood 25 per cent. of the amount paid on said bond, as shown above, with his pro rata part of the costs made to that time, and not otherwise. That said sum shall be liens thereon, and that upon receipt thereof with said papers said Atwood agrees to return said bond without delay.

"Said bondholder, recognizing the rights and interests of other bondholders joining in said suit, agrees (as do they) to help in this mutual undertaking by saying or doing nothing to obstruct, hinder or delay the successful prosecution of said suit, and by sending to said Atwood at once all communications and conversations with the representatives of the defendants, that he may be promptly advised and better able to guard the rights of all his clients against any illadvised words attributed to any of them, and against the persistent and peculiar methods of certain unscrupulous traveling representatives in their plans to approach and persuade each one to betray and injure the cause of all, by trying to control them and their course in this suit.

"Witness our hands in duplicate this ...... day of ......, A. D. ......, in the presence of

............, Bondholder.

............, Witness for the Bondholder.

............, Attorney at Law.

............, Witness for Atwood."

Many of the allegations of this circular are untrue, or at least are not sustained by the evidence in this case.

It is contended by the defendants that this case was properly dismissed under the rule that he who would have relief in a court of equity must come with clean hands. Inasmuch as it is probable that this action by the complainant Watson could not be attributed to his coplaintiff Olson or to the interveners, it does not seem important to determine whether this conduct of Dr. Watson alone precludes recovery by him. It is, however, somewhat remarkable in view of this effort to stir up litigation that of the more than 30,000 policy and bond holders not 20 persons appear from the record to be complaining.

An examination of the facts shown may partially explain why almost none of the policy and bond holders have joined.

Twelve days before the contract between the Security Company and the Trust Company, M. Beehler, an examiner of the Iowa Insurance Department, reported to Frank F. Merriam, Auditor of State, that the total liabilities of the Security Company were $419,-985.40 and its total assets were $405,638.37. In other words, its entire assets only exceeded its capital by less than $6,000. It owed for salaries and sundry items outside of reserve and capital $4,485.40. Its reserve liability was $15,500. If its capital and sundry liabilities be deducted from its assets it had less than $1,200 left to cover its reserve liability of $15,500. Its capital was impaired $14,347.03. In the period of its active existence of about a year and seven months it had taken in aside from payments on its capital stock $167,523.56, and all of this had disappeared but $5,638.37. Its total assets did not equal its capital stock and the interest thereon during the period of its active life. Clearly the company was insolvent.

It is somewhat difficult to determine the solvency of the Trust Company at the time of its transfer to the Federal Company. The only detailed statement as to its condition is as of December 31, 1902, between the purchase from the Security Company and the sale to the Federal Company. That statement shows assets and liabilities each of $992,094.68. This statement in the schedule of liabilities only lists the capital stock at $100,000; whereas, it had been increased to $200,000 more than a year and a half before. No explanation is made of this discrepancy, but it leaves it in grave doubt whether the Trust Company was solvent or not at the time of the transfer to the Federal Company.

On December 30, 1902, the Insurance Department of the District of Columbia reported that upon a full examination made as of April 30, 1902, it was found that the capital of the Federal Company had been impaired $617,016.03; that this was due to loans made on real estate years before when values were inflated and the total rejection of assets of $230,066.70, from which more or less would ultimately be realized.

The Insurance Department further reported that the stockholders had voluntarily contributed of cash and approved securities to the full amount of $617,016.03, and that the company was then placed in

the way of comparison as to financial strength favorably with any institution conducting its business on similar plans in existence.

The policies and bonds in question were issued on what is known as the "Preliminary Term Plan." That is, they provided that for the first year the reserve value should be computed for one year term insurance and for subsequent years such value for the age at issuance advanced one year. Many, if not all, the Federal Company's policies contained this preliminary term provision.

Rule 2, promulgated April 26, 1903, by the Superintendent of Insurance of the District of Columbia, requires the reserve to begin and be maintained during the existence of the policy from the time of its issuance to delivery regardless of any stipulation reserving the right of companies to value policies the first year or subsequent years as preliminary term insurance. There was no statute to that effect. Doubtless this ruling had its influence in the organization of the Illinois Company to take over the Federal Company. The Federal Company was licensed to do business in Iowa and Illinois, and there is nothing to indicate that after the capital was made good and it was so highly complimented by the Superintendent of Insurance of the District of Columbia it was at any time insolvent or threatened with insolvency. The Illinois Company has always claimed to be a mere reorganization of the Federal Company. It was organized under the same name, with the same stockholders holding the same shares of stock, with the same officers, the same capital, and was domiciled where the actual headquarters of the Federal Company had been for nearly a quarter of a century, occupied the same offices, took over the same assets, and assumed the same liabilities. It was in every sense a mere reorganization of the Federal Company in fact, whether it was such in law or not.

It is not necessary to determine whether in a legal sense a corporation organized under the laws of Illinois could be a reorganization of a corporation organized under an act of Congress.

There was neither fraud nor concealment as to any of these reinsurance agreements. The Trust Company gave its own number to each of the outstanding policies of the Security Company and sent by mail to each policy holder an assumption certificate. Such a certificate of assumption was sent to complainant Fred A. Olson on November 29, 1902. The Federal Company as of May 12, 1903, sent the policy holders of the Trust Company in one envelope a certificate of assumption and a letter announcing the transfer to it and directing the bondholder to attach the certificate of assumption to his bond, a special notice of where to pay premiums, and an advertising circular. For some reason these papers do not seem to have been mailed to George Rodecker. Some of the parties admit receiving these papers, some do not remember doing so, but none deny their receipt. The parties receiving them retained these certificates of assumption and made no objection or protest to the transaction for nearly two years, but paid their premiums as directed either to the Federal Company or its successor the Illinois Company. It is true some of these now swear they threw these certificates in the waste

basket, but do not indicate when, and they did not in any way advise the company of these acts of repudiation on their part.

The contract between the Trust Company and the Federal Company contained the following provisions:

"Second. The party of the first part further agrees that it will furnish to the Auditor of State of Iowa, whenever required by him, such information as may be necessary to enable him to ascertain the net cash value of every insurance and investment contract and of every bond and policy of the said party of the second part in force at the date of this agreement, such cash value to be computed as provided by the law of the state of Iowa; or will, at the option of the Auditor of State, make such valuation and furnish satisfactory proof of its correctness.

"Third. The party of the first part further agrees that it will preserve and maintain in the office of the Auditor of State of Iowa the deposit of securities, now with said Auditor, or others of like kind and character, to an amount equal to the net cash value of all the insurance and investment contracts, bonds, and policies of the party of the second part in force at the date of this agreement subject only to such diminution as may be caused by reduction of said net cash value; and that it will from time to time add thereto of lawful securities such amounts as may be necessary to make said deposit at all times equal to any increased net cash value of said contracts, bonds and policies.

"Fourth. The party of the first part further agrees that it will make and file with the Auditor of State of the state of Iowa, an agreement binding itself to preserve and maintain such deposit of securities, and to be controlled and governed by the laws of the state of Iowa in that respect as fully as though it were a corporation organized under the laws of the state of Iowa."

The Federal Company executed and delivered to B. F. Carroll, Auditor of State of Iowa, the agreement provided for in the article numbered fourth. He then approved the transfer, and on June 9, 1903, a letter signed by him was sent to each of the bondholders explaining what had been done. On April 4, 1904, the Illinois Company sent a letter to each of the Federal Company policy and bond holders, in which it said:

"The company has recently rechartered itself under the laws of Illinois. Henceforth its home office will be in Chicago where its principal branch office has always been located. This will be a great aid in facilitating the handling of our growing business."

[1] It is strenuously urged that it is impossible as a matter of law for a company chartered by act of Congress to recharter itself under the laws of a state, and that therefore this letter, instead of being a notice of the actual transaction, was in fact a false statement and constituted a fraud upon the policy and bond holders.

Conceding for this case the correctness of the legal proposition that a company organized under an act of Congress cannot preserve its identity for all purposes with a company subsequently organized under the state laws, appellants put a very strained construction on the language used in the letter. It is no uncommon thing, when the controlling spirits in a corporation become dissatisfied with the laws or conditions surrounding them in the home of the corporation, to practically reincorporate in a foreign state by organizing a nominally new corporation there and turning over to such new corporation the entire business of the old even if for every purpose the identity of

the new corporation and the old cannot be maintained. If the absolute identity of such a new corporation with its predecessor cannot exist in law, it is still a common expression to say that the old company has reincorporated in the state in which the new company has organized. If it were possible to maintain the life of a corporation from state to state so that a literal rechartering in a foreign state were possible, the argument for appellants would be much stronger because it could then well be contended that, while it was possible for the statement in the letter to be literally true, it was not literally true in this case. Here was a practical rechartering for many purposes. A new company was organized under the laws of Illinois at the instance of the managers of the Federal Company. It had the same name, the same capital held by the same persons in the same relative shares. It had the same officers and the same actual headquarters. It was organized for the very purpose of succeeding to taking over and carrying on the business of the old company, and did so. It was in every detail as nearly a rechartering of the old company as was possible according to appellants' contention. It was what is commonly spoken of as a "reincorporation." Appellants first contend that nothing more in the way of rechartering was legally possible that they may then contend the letter used the expression in an impossible sense and the letter was, therefore, a fraud. The expression "has recently rechartered itself" cannot be held to have meant to assert that something impossible had been accomplished, but that in a practical sense the new company was a reorganization of the old, and such it was. The board of directors of the Illinois Company adopted a resolution reciting that that company was a mere reorganization and reincorporation of the Federal Company and binding and obligating the Illinois Company to the full performance of the agreements of the Federal Company with the Trust Company and the state of Iowa, and the Illinois Company notified Auditor Carroll of this action. Each one of these companies has during the entire term of its responsibility so to do kept securities to the amount of reserve required with the Iowa Auditor of State. Such securities covering the savings fund and profit fund have not been so deposited and the contracts did not require that they should be. The Illinois Company has kept the amount of these funds segregated on its books; but owing to lapses, reinstatements, and numerous other causes it is a daily changing amount. It has not kept the amount of such funds due the Security Company policy holders separate from the amount due the Trust Company bondholders, but it has in every instance promptly complied with every request of the Iowa Auditor of State for information concerning such matters.

[2] No one of these defendants was empowered to transfer its policy holders without their consent to another company; but it is equally true that, if a solvent person or corporation agrees to assume and pay obligations of another, that is in legal contemplation an agreement for the benefit of the creditor. Each policy holder in this case when an attempt was made to transfer him had at least three options:

First, treat the transfer as an abandonment of the contract and

189 F.—56

bring an action at once for an accounting and recovery of the amount then due on his policy or bond. Lovell v. St. Louis Mutual Life, 111 U. S. 264, 4 Sup. Ct. 390, 28 L. Ed. 423.

Second, continue to pay his premiums under protest and thus keep the contract alive as against the company by whom it was issued and against the assets transferred by it.

Third, acquiesce in the transfer and assumption of his claim and accept the new insurer.

But he could not at the same time ratify and repudiate the transfer. He could not retain an assumption certificate by the new company, pay his premiums without protest to the company taking over the business, and then after a long period of time hold the new company if it was then to his advantage to do so or repudiate it if that best served his purposes. He must elect his course, and, having once made a definite election, must abide by it in the absence of some new agreement. He was required to make his election with reasonable promptness, taking into consideration the fact that this was a business in which many were interested and conditions rapidly changing.

The complainant Olson was notified of the transfer from the Security Company to the Trust Company, presumptively received the assumption certificate, retained it, in no way repudiated the transfer at the time, but on the contrary paid thereafter without protest to the Trust Company his premium due March 1, 1903. He thus acquiesced in the transfer from the Security Company to the Trust Company. He lapsed September 1, 1903, before the transfer from the Trust Company to the Federal Company, has never made application for reinstatement, and has no concern with what the Trust Company did after he lapsed.

Dr. Watson says he got the certificate of assumption of the Federal Company, the circular letter of May 12, 1903, and the letter of Auditor Carroll of June 9, 1903, and retained them. He made no protest then or when he paid his next premium. He says he had no knowledge of the transfer to the Illinois Company until after his last payment, which was about October 7, 1905, and then learned of it from a current number of the Chicago Record-Herald. A search of its files shows that the only such announcement was on March 4, 1904. He paid without protest two installments of premium to the Federal Company and seven to the Illinois Company. He must be held to have elected to assent to the transfer and to the substitution of the Illinois Company as his insurer and has no right to relief here.

George Rodecker having paid two installments of premium to the Illinois Company lapsed March 1, 1906. After more than a year in default he made direct application to the Illinois Company for reinstatement on its regular blanks and was reinstated by it and has paid ever since. He has no right to maintain this action.

Frank R. Conklin says he first heard of the transfer to the Federal Company by the Carroll letter of June 9th and believes he received the assumption certificate of the Federal Company. He says he does not remember receiving the letter of the Illinois Company announcing

the recharter of the National Life, but cannot say positively that he did not receive it. He failed to pay his premium due April 1, 1906, but was reinstated March 30, 1907. He changed the Illinois Company's form of application for revivor to read to the National Life & Trust Company, but he presented it to the Illinois Company and paid the premium then in arrears and the one then due directly to the cashier of the Illinois Company. He had before this made one payment to the Federal Company and two payments to the Illinois Company. When he presented an application for revivor to the Illinois Company and asked his reinstatement, he certainly elected to continue the policy in force and could not later insist that the contract was terminated by the transfer by the Trust Company. When he made his first two payments to the Illinois Company, he gave no intimation that the assumption certificate was not accepted. By more than one distinct act he made his election, and it is irrevocable.

Amelia M. Conklin is the wife of Frank R. Conklin, and the history of her bond is substantially identical with that of her husband, who acted as her agent at least in securing her reinstatement after lapse. She remembers receiving a letter of the description of the one issued by the Federal Company to the bondholders of the Trust Company as of May 12, 1903.

Dennis E. Sullivan says he received the letter of May 12, 1903, announcing the transfer to the Federal Company, does not recollect the letter of June 4, 1904, announcing the recharter of the National Life, but cannot say he did not receive it. He retained the certificate of assumption of the Federal Company and has paid six installments of premium to the Illinois Company. Having made his election, he must abide by it.

Russell T. Barr was not a witness, and there is no denial that he received all the notices and no showing that he returned or in any manner repudiated the certificate of assumption by the Federal Company. He paid without protest three installments of premium to the Federal Company and seventeen to the Illinois Company. He lapsed December 1, 1906, and was reinstated November 30, 1907, upon his direct application to the Illinois Company. It is true he did not sign the form of application for revivor furnished him by the company, but based his failure so to do solely upon the ground that the application form furnished contained agreements and warranties not in the original contract. It is true some of the parties swear they threw the assumption certificates sent them in the waste basket, but do not indicate when they did so, whether before or after suit brought or before or after payments without protest to the new company. In any event, they gave no notice of such action to the reinsuring company, but went on paying premiums. It thus appears that all the plaintiffs and interveners are equitably estopped to maintain this action, and none of them are entitled to relief on their own behalf or on behalf of others.

On the former appeal this court said:

"Language is indeed employed which by fair import leads us to believe that all the complainants and interveners formally, at least, accepted provisions

FEDERAL REPORTER

made for and tendered to them in the several reinsuring contracts. But in view of the averments of the bill, anticipating and avoiding an expected plea of novation, we are unable on this demurrer to give force or effect to the import of the language in question. This is a proceeding in equity, where general relief is prayed for, and where the averments of the bill are admitted to be true. Accordingly, if an apparent novation occurred, but was brought about by fraud legally sufficient to avoid it, we cannot say that complainants, upon establishing such facts, would not be entitled to some relief. The proof upon final hearing must develop this phase of the case."

[3] The record fails to show that novation was brought about by fraud. Where a record shows that none of the complainants of record have any right to relief, the court cannot grant relief to those unnamed persons on whose behalf it is claimed the suit is brought. It is therefore unnecessary to pursue the inquiry as to the supporters of this proceeding not made parties. Suffice it to say the record has been examined with great care, and none of them are in any better position to maintain this action than the parties to the record.

[4] Insurance companies are not classed as public but as private corporations. They are not even styled quasi public corporations, but a large insurance company is a public institution, and, where there is no apprehension as to its solvency, a court of equity will consider all the facts as to the relative advantages of a receivership or accounting before granting relief of that nature at the suit of individual policy holders. Such a court takes all the facts into consideration in determining whether to grant such relief which rests largely in cases of this nature in the discretion of the court. Equitable Life Assurance Society v. Brown, 213 U. S. 25, 29 Sup. Ct. 404, 53 L. Ed. 682.

It was insisted on the oral argument that the decree entered would preclude the parties and the supporters of the complainants who have continued to pay and do continue to pay to the end of the full 10-year period from recovery at that time on their bonds. This is a misconstruction of the decree.

The Circuit Court was right, and its decree is affirmed.