**COOK et al. v. DAVIS.**

No. 12727.

United States Court of Appeals
Fifth Circuit.

Dec. 28, 1949.

Rehearing Denied Feb. 6, 1950.

B. D. Murphy, Atlanta, Ga., J. M. B. Bloodworth, Atlanta, Ga., J. C. Savage, Atlanta, Ga., for appellant.

A. T. Walden, Atlanta, Ga., Oliver W. Hill, Richmond, Va. for appellee.

Before HOLMES, WALLER and SIBLEY, Circuit Judges.

SIBLEY, Circuit Judge.

Samuel Davis was in 1943 and still is a Negro teacher in the high schools for colored pupils in the City of Atlanta, Ga. Claiming that he and others similarly situated were by the Board of Education of the City of Atlanta discriminated against in salary as compared with white teachers having the same qualifications and duties solely because of his race and color contrary to the equal protection and due process clauses of the Fourteenth Amendment of the Constitution, he in his own behalf and in behalf of others similarly situated on July 2, 1943, filed in the district court a brief complaint against the members of the Board and against Willis A. Sutton, then Superintendent of Schools in Atlanta, praying for a declaratory judgment that their conduct is a violation of the Amendment, and for an injunction against them and their successors forbidding such conduct. A motion to dismiss was made, a principal ground of which was that the suit, being in purpose and effect a suit against the State of Georgia without the State's consent, is not within the judicial power of the United States under the Eleventh Amendment of the Constitution. The motion was overruled. An answer was made denying a present discrimination, but admitting that prior to Feb. 17, 1942, the State Board of Education had adopted separate schedules for white and colored teachers, over which the defendants have no control, and had delivered the money contributed by the State to maintain the schools in Atlanta for seven months in the year to be paid out by defendants in accordance with those schedules; and that defendants as the Board of Education of Atlanta, being authorized by law to extend the school term beyond seven months and to supplement salaries, had also adopted its separate salary schedules for white and colored teachers to be used in disbursing the money furnished for these uses by the City of Atlanta; that these separate schedules contained variations in salary between white and colored teachers and were apparently discriminatory, but the differences were not made on account of race and color but for other stated reasons in the exercise of their judgment in the effort to do what was fair to the teachers and the public; that on Feb. 17, 1942, a complaint similar to the present one was filed by William H. Reeves, and in response to it all the salary schedules of the Atlanta Board of Education were by it expressly abolished, and direction was given for the working out of a single salary plan for all teachers based on the merit of each and fixing a fair and just salary for each teacher.[1] Such a plan had, after delay due to the number of teachers and the difficulties encountered, been worked out and adopted by the Atlanta Board, and at the filing of the answer in July, 1944, the Superintendent of Schools was engaged in classifying the individual teachers under it. There were more than 1400 teachers. The answer denied that any controversy presently existed.

The Superintendent, Willis A. Sutton, having resigned, on motion of plaintiff the suit was on Nov. 3, 1947, dismissed as to him. A new Superintendent was elected, Miss Jarrell, but she was not made a party. After a lengthy trial on the merits the judge on Sept. 28, 1948, made findings of fact and conclusions of law ultimately unfavorable to the defendants, and on Dec. 18, 1948, made a decree against them declaring that their conduct and policy as officers "In paying to plaintiff and other Negro teachers and principals in the public schools in Atlanta, Ga., smaller salaries than are paid by said defendants to white teachers and principals with equal qualifications and experience, insofar as such differentials are predicated solely on race or color, * * * are unlawful and unconstitutional and in violation of the equal protection clause of the Fourteenth Amendment of the Consti-

1. The suit of Reeves was thereafter withdrawn.

tution and of Sections 41 and 43 of Title 8 of the United States Code". The decree then perpetually enjoins the defendants from "Discriminating in the payment of salaries against plaintiff and other negro teachers and principals in the public schools in Atlanta, Georgia, and in favor of white teachers and principals in said public schools on account of race or color." This appeal followed.

On the motion to dismiss and on the situation proven in the trial, we find it necessary to consider and decide three questions of a preliminary kind: Is the suit really against the State of Georgia and therefore not within the federal judicial power under the Eleventh Amendment of the Constitution? Are the acts of the defendants in fixing school teachers' salaries acts of the State within the prohibitions of the Fourteenth Amendment? Is it necessary before complaining in the federal courts to exhaust administrative remedies provided by State law? To answer them we must understand the educational set-up of the State of Georgia.

The State Constitution of 1868, directed the General Assembly at its first session to provide for "A thorough system of general education, to be forever free to all children of the State". Art. 6. The Constitution of 1877 restricted the public education to the "Elementary branches of an English education", Art. 8, § 5, par. 1, and ordered that "Separate schools shall be provided for the white and colored races." Art. 8, § 1, par. 1. Local school systems were preserved. In 1945 a new Constitution was adopted, Article VIII of which says: "The provision of an adequate education for the citizens shall be a primary obligation of the State of Georgia, the expense of which shall be provided for by taxation. Separate schools shall be provided for the white and colored races." § 1, par. 1. It provides for a State Board of Education appointed by the Governor with the advice and consent of the Senate, but that the first Board shall consist of those in office at the time the Constitution is adopted with the terms then provided by law, but succeeding appointments to be for seven years; with powers and duties such as now exist or as may hereafter be provided by law. A State School Superintendent elected by the people for four years and County School Superintendents elected in each County for four years are also provided for. Section VII is: "Authority is hereby granted to municipal corporations to maintain existing independent school systems, and support the same as authorized by special or general law * * *. No independent school system shall hereafter be established." par. 1. The City of Atlanta and several other larger cities have long had local school systems supported in part by the State and in part by the City, but not a part of the system of county schools nor subject in any manner to the control of the County School Superintendents, and in that sense they are called independent systems. Under the city charter and applicable laws the Atlanta school system is governed by a Board of Education of the City of Atlanta, at present the defendants, and a Superintendent of Schools of Atlanta. These are all public officers having a mode of appointment or election, a term of office, a salary, and duties fixed by law or city ordinance. Prior to 1937 the control of the Atlanta Board was practically complete. The State's money for schools was prorated by the State School Superintendent according to school population among the several Counties, and when a County had within it an independent School System that county's share was prorated similarly between the independent system and the county system, the former using its share as it saw fit. By the Act of Feb. 10, 1937, Georgia Acts 1937, p. 864, the State legislature repealed the previous law establishing a State Board of Education and set up a new one to consist of the Governor and a member from each of the ten Congressional districts of the State, having specified qualifications, taking an oath, receiving specified pay, and with the powers and duties of the former Board with these additional ones: To make rules and regulations for the supervision of all the public schools of the State; provide courses of study; and "for the classification and certification of teachers"; and rules and regulations "for the operation of the common schools and for the administration

of the common school fund." Estimates for the operation of the State public school system are to be by the Board submitted annually to the Governor and General Assembly. The State School Superintendent "shall enforce and administer the regulations adopted by the State Board of Education." Ga.Code Ann. § 32-504. This Act may be found in Georgia Code, Annotated, §§ 32-401 to 32-427. Another Act of the same Legislature, called the Equalization of Educational Opportunities Act, Acts of 1937, p. 882, Ga.Code, Ann. §§ 32-601 to 32-624, modified the school law greatly. By it the public schools of the State must be operated not less than seven school months in each school year; the several counties and independent school systems are made the "local units of administration"; in each local unit teachers and principals shall be elected by the respective boards of education on recommendation of their respective superintendents; and the superintendents and boards of education of the respective local units shall execute the provisions of the law under such regulations as may be adopted by the State Board of Education. Then came a provision, § 32-607, which excepted schools which operated under special Acts where the latter conflict with the new law. The independent schools of the City of Savannah were held to be entitled to continue under their special act in State Board of Education of Savannah v. Board of Public Education, 186 Ga. 783, 199 S.E. 641, decided September, 1938. The next Legislature repealed § 32-607, and in State Board of Education v. County Board of Education of Richmond County, 190 Ga. 588, 10 S.E.2d 369, it was held that the repeal put the independent school systems under the Equalization Act. The Atlanta schools we do not doubt are subject to that Act. Further pertinent provisions of that Act are that the State Board of Education shall annually determine the number of teachers to be employed for the seven months term on a basis of school attendance; shall provide by regulation for certifying and classifying the teachers, and no teacher shall be employed who has not a certificate from the State Board or a license from a county board issued pursuant to regulation; but by § 32-611 local units may provide by local funds for additional advantages and may make rules not in conflict with those prescribed by the State Board. But by § 32-615 local units may also operate their schools longer than seven months, and may supplement the scale of minimum salaries which the State Board annually fixes under § 32-613 and § 32-616, and may employ additional teachers. All local units must file annually for approval by the State Board a budget showing in detail all proposed expenditures and all expected revenue. By § 32-622 the State Board is charged with the duty of administering its provisions, and for this purpose the State Superintendent of Schools is its executive. Under the new State Constitution of 1945 this is all preserved as operative law till changed by the Legislature, though the State Board and State Superintendent are now constitutional officers.

The State Board therefore fixes the amount of State money which is to go each year to the Atlanta Board, and selects by certificates teachers who may be employed, and fixes the minimum salary to be paid each class of teachers as classified by itself. The Atlanta Board may take money furnished by the City of Atlanta to lengthen the term, and supplement the State salaries and employ more teachers. In practice, it seems the Atlanta Board mingles the monies furnished by the State and City, conducts its schools for nine months, and pays salaries for twelve months at rates in excess of the State Board's minimum salaries, but on a classification of teachers and a salary scale fixed by itself employing only teachers certified by the State Board. It is this salary scale of the Atlanta Board which is here attacked, and condemned by the decree, not on the ground that the Atlanta Board has no power to make such a scale, or that in itself it is discriminatory, but because in practice it has been so applied in classifying annually plaintiff Davis and other Negroes as to give them salaries less than they deserve, solely because of their color.

A remarkable state of facts appears in this record. All the legislation of the State is equal as to race and color. The

classification of the State Board is alike for white and colored teachers, but the minimum salary scale it fixes for each class is materially lower for colored than that for white teachers each year. There may be some other reason for it, but on its face it appears to be a discrimination based on color only. The Atlanta Board gets its money from the State on that basis and it would seem should not use it on any other. No one appears to have complained to the State Board. The Atlanta Board, prior to February 17, 1942, had also two separate salary scales, one for white and another for colored teachers, but at that date it abolished by resolution all its salary scales and made itself a committee of the whole to "make out a new basis for the pay of teachers which will be based wholly on valid considerations and will not discriminate against any person on account of race or color". On June 13, 1944, the new scheme for classification, for advancement, and for salary was at last adopted, which on its face provides for an appraisement each year of every teacher without discrimination by the same specified standards, and his placement in the scheme with the salary fixed for his placement. On October 1, 1944, along with his first salary check, each teacher was mailed a letter and a copy of the Classification Scheme and salaries, and of the procedure for its operation. The letter stated what the teacher's placement was and his salary, suggested that the enclosures be studied, and if his placement or progress in the scale be not understood, that his principal and the director of the Teachers Association be consulted; and it called attention to the provisions for appeal for a different placement. Plaintiff Davis admits getting this letter, and that he made no complaint and took no appeal. The new Superintendent, Miss Jarrell, who with the white and colored principals in the several schools made the placements each year, testifies that Davis made no complaint; and since this suit was pending, she asked him if he was still dissatisfied, and he said he "thought we were doing the best we could"; and she asked him to come and talk about his salary, but he never did. A few other teachers complained to her, and each complaint was satisfactorily adjusted. No one has ever appealed to the Atlanta Board or the State Board. Neither Davis nor any other witness denies this. As a result of the Atlanta Board's new classifications and placements the average of the colored teachers' salaries was raised about $10 per month, and of the white teachers about $2 per month, and to this extent the State Board's separate salary scales for white and colored teachers were remedied. The differences were not wholly overcome, apparently. The Superintendent and the defendants who testified say they are making a sincere, diligent, and successful effort to classify all their teachers according to their individual worth as teachers. No teacher but Davis testified, and he makes a very unimpressive case for himself. Expert accounting has been resorted to on both sides to reach "median salaries" by "sampling". We will not attempt at all to review the conclusions reached on the merits, further than to remark that in a class suit if there is a failure to make out a case for any named plaintiff, Davis being the only one here, there is authority that no decree can be rendered for plaintiffs. See 47 C.J., Parties, § 100; 21 C.J., Equity, § 487; 30 C.J.S., Equity, § 284, citing Watson v. National Life & Trust Co., 8 Cir., 189 F. 872, 884. In the matter of asserting constitutional rights touching discrimination, only someone who shows himself injured may complain; he cannot champion others who do not choose to complain. 11 Am. Jur., Constitutional Law, § 115. The decree too is very vague; it could not be of much practical help to the Board. Nor could it be easily enforced, for it only states in general terms a duty which no one disputes, with no specifics at all pointed out.

We decide this: 1. The suit is not against the State of Georgia in name or in effect. Nothing is sought to be recovered against the State, nor is any right of the State sought to be impaired. The validity of its statutes is not even impugned. It seeks only to have public funds which have been duly appropriated rightly paid out by administrative officers according to law.

The Eleventh Amendment as interpreted in Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842, does not apply.

■ 2. The action of these administrative officers is State action within the Fourteenth Amendment. They are acting for the State under authority of its laws. If in doing this they deny any person the equal protection of the law they may be stopped by virtue of the amendment as officers.

■■ 3. The broad principle that administrative remedies ought to be exhausted before applying to a court for extraordinary relief, and especially where the federal power impinges on State activities under our federal system, applies to this case. "No one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Myers v. Bethlehem Shipbuilding Corporation, 303 U.S. 41, at page 50, 58 S.Ct. 459, at page 463, 82 L.Ed. 638, citing many cases relating to relief by injunction. We held in Bradley Lumber Co. v. National Labor Relations Board, 5 Cir., 84 F.2d 97, that the same principle applies to relief by declaratory decree. "The rule that a suitor must exhaust his administrative remedies before seeking the extraordinary relief of a court of equity (citing many cases), is of special force when resort is had to the federal courts to restrain the action of state officers (again citing many cases)"; Natural Gas Pipeline Co. v. Slattery, 302 U.S. 300, at page 310, 58 S.Ct. 199, at page 204, 82 L.Ed. 276. At page 311 of 302 U.S., at page 311 of 58 S.Ct. the court, pertinently to the present case, observes: "There are cogent reasons for requiring resort in the first instance to the administrative tribunal when the particular method by which it has chosen to exercise authority, a matter peculiarly within its competence, is also under attack, for there is a possibility of removal of these issues from the case by modification of its order." The federal courts have undoubted jurisdiction to enquire by the writ of habeas corpus whether a restraint of liberty under State authority is contrary to the federal constitution, but the rule is well settled that ordinarily State remedies must first be exhausted, Ex parte Hawk, 321 U.S. 114, 64 S. Ct. 448, 88 L.Ed. 572, and this rule has been made statute by revised Title 28 U.S.C.A. § 2254. The most recent decision about it is Dye, Warden, v. Johnson, 70 S.Ct. 146, where the rule was held applicable to extradition proceedings.

■ In the case before us both the State Board and the Atlanta Board have unchallenged authority touching salary scales, and the issue is as to the method of its exercise, each having power to correct what it has done wrongly. The root of the trouble really seems to be in the classifications and salaries fixed by the State Board, over which the Atlanta Board has no power, being subject to the State Board. The State Board is not here impleaded nor does any complaint seem ever to have been made to it. The Atlanta Board has sought since June, 1944, to moderate the inequality made by the State Board as to the money furnished by the State, and has itself devised a non-discriminatory scheme of individual classification and salaries with which no fault is found. The fault asserted is on the part of the Atlanta Superintendent in placing the individual teachers year by year. The scheme includes the setting up of a committee whose advice may be sought by the Superintendent in cases of dissatisfaction, but since the dissatisfied teacher cannot invoke the service of this committee, it is not a remedy to be here considered. The scheme further provides: "Any teacher who is dissatisfied with the action of the Superintendent on appeal may request the Board of Education to review the same. Such request shall be made in writing within ten days from the action of the Superintendent. The Board shall consider such request, and review the action of the Superintendent. The action thereon shall be final." But it is really not final, because the Act of 1937 establishing the State Board, Ga. Code Ann. § 32-414, states: "The State Board of Education shall have appellate jurisdiction in all school matters which may be appealed from any county or city board of education, and its decisions in all such

matters shall be final and conclusive"; and the mode of appeal is provided. We think the Atlanta Board could on appeal to it rectify the actions of its Superintendent, and the State Board on appeal to it could control the Atlanta Board both as to its scheme of salaries and the application of it to individual teachers, and could also revise its own salary scales if that ought to be done. All these are "school matters". No appeals have been taken to any one. According to uncontradicted evidence all complaints to the Atlanta Superintendent have been satisfactorily adjusted. There is no reason to believe that appeals to the Boards would be futile.

The excuses made for not appealing, accepted by the trial court, are that the appeals provided are illusory, being to the same persons who did the wrong; and that at the time the suit was filed in July, 1943, they had not been provided for; and that they are only judicial remedies in State tribunals which cannot displace the right, if it exists, to sue in a federal court. On the last point the district judge cited from appellate courts Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281; Mitchell v. Wright, 5 Cir., 154 F.2d 924; and Morris v. Williams, 8 Cir., 149 F.2d 703. Morris v. Williams does not however discuss the question now under discussion. These excuses are not good. The appeal to the Atlanta Board from the decisions of the Atlanta Superintendent and her aids as to individual placements and salaries is not to the same persons who did the wrong. The Board, after the ten days allowed for appeal, makes annual contracts with the teachers recommended by the Superintendent at the salaries recommended, but if the Superintendent erred in making the recommendations the members of the Board had no part in it, and may properly act to correct it. The State Board is even further removed from the error of the Atlanta Superintendent.

At the time this suit was filed the appeal to the State Board existed. That to the Atlanta Board, so far as appears, was first created in June, 1944, when the new plan of placement was adopted. But the trial court repeatedly ruled, and we think correctly, that the relief sought by the declaratory decree and injunction relates to discriminations at the time of the decree and not at the filing of the petition. The teachers in Georgia are not public officers who can be removed at the will of the appointing power, but are employees under annual contract, and may enforce their contract of employment by suit against their school boards. Board of Education of Doerun v. Bacon, 22 Ga.App. 72, 95 S.E. 753. The decree before us was so worded as not to interfere with the contracts for the current school year. What has happened in the past is only evidentiary. As each year's classifications and salaries are fixed the appeals then provided ought to be used. But failure to use that provided since the filing of the suit ought not justly to cause dismissal of the suit now. Even that to the State Board which was open all the time, since failure to use it was not made a ground of the motion to dismiss, ought not we think to have that result after a long process of taking evidence without raising the point. But when raised before decree, which was to operate only in the future, we think the decree ought to have been withheld till the remedies then available shall be exhausted, because the pursuit of them may cause an adjustment of the controversy, and will certainly bring to a focus the particular wrongs so as to enable the court to frame a more specific and useful decree.

The appeals are not State judicial remedies within the decisions above cited. Neither Board is a court whose decision creates a *res judicata*. The finality reached by them is only a final administrative action by ordinary administrative bodies, which makes the administrative process ripe for proper court review. The appeals are ordinary administrative remedies well within the general rule which requires their exhaustion before recourse is had to a federal court touching State activities.

Therefore, upholding the court's jurisdiction, we set aside the findings and the decree as improvidently granted, and direct that the cause be remanded to the District Court and remain pending for a reasonable

time to permit exhaustion of administrative remedies; and thereafter such further proceedings may be had as shall then appear to be proper.

Reversed and remanded with direction.

On Motion for Rehearing.

### PER CURIAM.

The petition for rehearing in the above stated cause is hereby denied. Exhaustion of state remedies is a rule of self-restraint formulated by the federal courts and is not influenced by state practice.

Denied.