## BLUE et al. v. DURHAM PUBLIC SCHOOL DIST. et al.
### Civ. A. No. 136.

United States District Court
M. D. North Carolina, Durham Division.
Jan. 26, 1951.

442

Hugh Thompson, J. H. Wheeler, Durham, N. C., Hill, Martin & Robinson, Richmond, Va., for plaintiff.

Fuller, Reade Umstead & Fuller, Durham, N. C., Harry McMullan, Atty. Gen., of N. C., Ralph Moody, Asst. Atty. Gen., for defendant.

HAYES, District Judge.

The plaintiffs, children of school age and their parents as guardians or next friends appointed by the court, are citizens of, and reside in Durham, N. C. On May 18, 1949, they filed their complaint against Durham Public School District, the school Committee of the Town of Durham, known as Board of Education of the City of Durham, J. Stacy Weaver, Superintendent of Schools, J. L. Woodward, Business Manager, referred to hereafter as the local defendants and the individual members of the State Board of Education, and Clyde A. Erwin, State Superintendent of Public Instruction, referred to hereafter as the State Officials. It is alleged that the defendants are depriving the plaintiffs of their rights under the 14th Amendment to

the Constitution of the United States in that the Negro school children are being denied the equal protection of the law, on account of their race and color, by discriminating against them in the public school facilities.

■ This is not a suit against the State of North Carolina as contended by the State officials. The constitution of North Carolina and the public laws of the State require the officials to conduct the free public school system and to require the children of the white race and the children of the colored race to be taught in separate public schools: but there shall be no discrimination in favor of or to the prejudice of either race. G.S. § 115–2. The Constitution of the State contains the same language and the Constitutional provision is mandatory and may not be disregarded either by the Legislature or by officials charged with the duty of administering the law. Smith v. Board of Trustees, 141 N.C. 143, 53 S.E. 524. There is no law of this State which requires the school officials to discriminate against Negro school children. If discriminations are permitted or practiced, the officials are not executing the laws of the state: therefore a suit against the officials is not a suit against the state. Taylor v. Louisville & N. R. Co., 6 Cir., 88 F. 350; Greene v. Louisville & I. R. Co., 244 U.S. 499, 500, 516, 37 S.Ct. 673, 61 L.Ed. 1280; Williams v. Chicago & N. R. Co., 273 U.S. 670, 47 S.Ct. 474, 71 L.Ed. 832. See also Cook v. Davis, 5 Cir., 178 F.2d 595, 599.

Until 1933, the public schools of this state, while constituting a so-called statewide system, were financed by ad valorem taxes and each county provided school buildings and equipment and the entire expense of operation, but the state, in order to equalize the educational opportunity, created an equalization fund to supplement the inadequate funds raised in the poorer sections of the state. The school machinery Act of 1933, which was re-enacted each biennium until it was made permanent in 1939, G.S. § 115–347 et seq., made provision for state support of a uniform system of public schools throughout the state. In 1943 the term was extended to nine months. G.S. § 115–347. It is the duty of the State Board to administer the funds for the operation of a nine months school term. G.S. § 115–350. The expense of erecting, repairing and equipping school buildings is still to be borne by the county, G.S. §§ 115–83 and 84, and title to site and buildings vests in the local administrative unit. G.S. § 115–85; The objects of expenditure of state funds are enumerated in G.S. § 115–356. The powers of the State Board are set forth in Sec. 115–31.2, Subsection 1 specifies: "To have the general supervision and administration of the free public school system, and of the educational funds provided for the support thereof". Subsection 7 authorizes it to "make all needful rules and regulations in relation thereto." The state superintendent is granted specific powers in Section 115–31.7, subsection 10 being: "Such other duties as the board may assign to him from time to time."

Chapter 1020, Laws 1949, creates a special fund of $50,000,000 ($25,000,000 of which was to be approved by the voters of the state) to aid counties in the construction of school plants under the direction and supervision of the State Board of Education and authorizes it to make surveys and plans for such buildings. It is clear, however, that these powers were to safeguard the expenditure of this special fund and it was not intended to supersede the power of the County Board of Education or City School District Board. The primary duty to provide capital funds—buildings and equipment is imposed on the local administrative unit out of funds to be provided by the county from local taxes, etc.

■ It appears from the foregoing statutes that the State officials are given broad general powers over the public school system which must be construed in connection with statutes which confer specific authority on local officials. The decisions of the North Carolina Supreme Court have consistently upheld the powers of the local authorities. We have not found a case construing the effect of the 1949 Act. So far as this litigation is involved, it is

necessary only to determine whether this Act of 1949 makes any substantial change in the powers of the State officials over local officials. The question is perhaps moot because the plaintiffs have failed to show that, in the use of the current $2,000,000 Durham building program in which the state has contributed a large sum, the fund was expended to the prejudice of the plaintiffs on account of their race and color. The evidence discloses that this particular fund was equitably and fairly used most advantageously for each race and without prejudice to either. However, the local authorities must initiate a building program and the state officials may approve or disapprove such action. The proof here does not show that the state officials denied plaintiffs any right by reason of their race or color. The mere discretionary powers of the state officials are not to be controlled by injunctive power of the court. It follows that the action against the state officials must be dismissed.

The legislative branch of North Carolina has conferred specific power on the County Board of Education to provide plant facilities—buildings and equipment—and general control over the public school system. G.S. § 115–54 et seq. A city administrative unit has similar power over the city schools. G.S. §§ 115–83, 115–352. Coggins v. Board of Education, 223 N.C. 763, 28 S.E.2d 527; Bridges v. Charlotte, 221 N.C. 472, 20 S.E. 2d 825; Atkins v. McAden, 229 N.C. 752, 51 S.E.2d 484. Other pertinent sections are 115–57, 58, 59, 73, 77 and 81, 124–129.

The local officials concede many disparities between the facilities available to the negro school children as compared to those afforded white children, most of which arises from unequal plant facilities. They seek to excuse the apparent discriminations on the ground that the present Board and its local school officials are rapidly removing the conditions; that the Board has been handicapped for lack of funds and building restrictions; that a shift of population resulting in an increase from 30% to 45% in negro school population and the moving of white children from existing school facilities to other sections of the city, resulting in the necessity of building for white children in the new communities and rendering obsolete at least a part of the old buildings for white children while negro schools were over-crowded. While these circumstances are plausible and to some extent ameliorate the responsibility of the local authorities, they do not afford a legal excuse or justification for not furnishing the negro school children substantially equal educational facilities to those furnished white children. Considering the average daily attendance which is practically 55 white to 45 negro, we have 13 school buildings for white children at a cost of $3,164,307.55 to 8 buildings for negro children at a cost of $1,604,891.73; we have three excellent Junior high schools well distributed over the city for the convenience of these white children and none for the negroes; arrangements exist for cafeterias, gymnasium, music, art, home economics, laboratories and equipment, and playgrounds for the white children, while some of these facilities are denied in many of the negro schools. By reason of the existence of more abundant building space for white children and the crowded conditions in the negro schools, white children enjoy many superior advantages to those available to the negro children, towit: More and better supervision, greater extra curricular opportunities, better laboratory equipment and facilities, in music and art, lighter teacher load, better recreational facilities and better accommodations.

The present local officials have not had an easy task to meet the demands of the white school children and to match them with similar conveniences for the negro children, due to a lack of funds and other handicaps. It is also true that they contemplate the conversion of the Whitted High School, in the near future, into a Junior High School. The fact remains, however, that the net result of what has been done still leaves the negro school children at many disadvantages which must be overcome before substantially equal facilities are made available to the negro children.

The law as defined by our Circuit in three comparatively recent decisions needs no enlargement or clarification by this

court. Each of our three distinguished U. S. Circuit Judges has written an opinion for an undivided court; namely, Judge Parker in Alston v. School Board of City of Norfolk, 112 F.2d 992, 130 A.L.R. 1506; involving discrimination against negro school teachers; Judge Dobie in Corbin v. County School Board of Pulaski County, 177 F.2d 924, involving high and elementary schools, and Judge Soper in Carter v. School Board of Arlington County, Va., 182 F.2d 531, 534, involving high school facilities. From the last case we quote two parts which meet our problem here: "It is established, however, that the right of the individual student to the privilege of public instruction equivalent to that given by the state to the individual student of another race, is a personal one and equivalency cannot be determined by weighing the respective advantages furnished to the two groups of which the individuals are members * * * the question cannot be decided by averaging the facilities provided for the two classes of pupils throughout the county and comparing one with the other, since the rights created by the Fourteenth Amendment are individual and personal and the prohibitions of the Amendment are observed only when the same or equivalent treatment is accorded to persons of different races similarly situated." And, 182 F.2d at page 535, "The differences between the two schools are not merely unimportant variations incident to the maintenance of separate establishments, but constitute unlawful discriminations against pupils of the colored race; and it is no defense that they flow in part from variations in the size of the respective student bodies or locations of the buildings. The burdens inherent in segregation must be met by the state which maintains the practice. Nor can it be said that a scholar who is deprived of his due must apply to the administrative authorities and not to the courts for relief. An injured person must of course show that the state has denied him advantages accorded to others in like situation, but when this is established, his right of access to the courts is absolute and complete."

The policy of the present local authorities to average expenditures on the basis of average daily attendance in the two races is not the proper legal test; nor is adequacy of facilities sufficient to meet the test of equivalency of educational opportunity. The law of our Circuit requires substantial equality of facilities and opportunities for negro school children as those available to white children, similarly situated.

It follows from what has been stated above that the plaintiffs have been, and are, discriminated against on account of their race and that they are entitled to injunctive relief.