Martin SOSTRE, Plaintiff,

v.

Nelson A. ROCKEFELLER, Paul D. McGinnis, Vincent Mancusi and Harold W. Follette, Defendants.

No. 68 Civ. 4058.

United States District Court,
S. D. New York.

May 14, 1970.

------

Rabinowitz, Boudin & Standard, by Victor Rabinowitz and Kristin Glen, New York City, for plaintiff.

Louis J. Lefkowitz, Atty. Gen., State of New York, by Mark T. Walsh and Hillel Hoffman, Asst. Attys. Gen., New York City, for defendants.

## OPINION

## FINDINGS OF FACT, CONCLUSIONS OF LAW

MOTLEY, District Judge.

This is a civil rights action, 42 U.S.C. § 1983, 28 U.S.C. § 1343(3), brought by plaintiff, Martin Sostre, an "Afro-American citizen of the United States" and resident of Green Haven Prison against the Governor of New York, the Commissioner of Corrections and the Wardens of two New York State prisons.[1]

Mr. Sostre is no stranger to the New York State prison system, having already served twelve years, 1952–1964, four of which were spent in solitary confinement at Attica State Prison for Black Muslim activity. (T. 3, 7, 160–166). He is also no stranger to the federal courts with his civil rights complaints against New York prison officials. (T. 4). He secured for Black Muslim prisoners their rights to certain unrestricted religious liberties during his prior incarceration. Pierce, Sostre, Sa Marion v. La Vallee, 293 F.2d 233 (2d Cir. 1961) and Sostre v. McGinnis, 334 F.2d 906 (2d Cir.), cert. den., 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed. 2d 96 (1964). His earlier legal activity also resulted in the elimination of some of the more outrageously inhumane aspects of solitary confinement in some of the state's prisons.[2] (T. 163, 167).

Martin Sostre is again in prison. This time he is there pursuant to a sentence of 30–40 years, to be followed by a one year sentence and a sentence of 30 days for contempt of court, imposed upon him by the Supreme Court of New York, Erie County, on March 18, 1968. (Def. Proposed Finding of Fact No. 1 and Exh. A).

On the day of his sentence, he was immediately taken to Attica Prison where he remained overnight in a cell block which contained no other prisoners. (T. 5–6, 157–158). The next morning, he was taken in a "one-man draft" to Green Haven Prison. (T. 6, 538). According to the Deputy Warden in charge of Attica (the warden, a defendant here, being on vacation), he sought Sostre's removal from that prison as soon as possible. (T. 520). He, therefore, called the office of the Commissioner of

---

1. Jurisdiction is also predicated on 28 U.S. C. § 1331. Plaintiff refers to himself in the complaint as an "Afro-American citizen of the United States."

2. If there is substance to plaintiff's allegations in Wright v. McMann, 387 F.2d 519 (2d Cir. 1967), then Sostre's reform efforts have failed to eliminate the more outrageously inhumane aspects of solitary confinement at all of New York's prisons.

Corrections of the State of New York and spoke to the Deputy Commissioner who approved the transfer. (T. 520–521; Def. Proposed Finding of Fact No. 11). The Deputy Warden of Attica testified vaguely and without substantiation as follows: "I thought it was best for the interests of the inmate and for the state that this man be transferred to another institution." (T. 521).

Immediately after his arrival at Attica, Sostre began a legal battle for reversal of his conviction.[3] He sought to mail an application for a certificate of reasonable doubt to the state court which he had prepared prior to sentence, but the guard at Attica refused to mail the application. (T. 181–182, 638–640).

The next day, Sostre found himself in solitary confinement in Green Haven where he remained for several days. (T. 8–9, 11; Pl. Exh. 37 at 2; Def. Proposed Finding of Fact No. 13). He was then permitted to join the general population and to mail his application for a certificate of reasonable doubt. (T. 259–260).

However, shortly thereafter, on June 25, 1968, Sostre was back in solitary confinement (now called "punitive segregation" by defendants). He remained in such confinement until July 2, 1969, when he was returned to the general population pursuant to a temporary restraining order issued by this court in the present action, followed by a preliminary injunction. 309 F.Supp. 611 (S.D. N.Y. Sept. 4, 1969). A trial followed upon which were established the facts found herein and upon which the relief granted in this opinion is based.

On June 25, 1968, Sostre placed in the prison mail box for mailing to his attorney a letter with handwritten legal motions and other papers attached. One of these was a motion for change of venue of the trial of his codefendant, Mrs. Geraldine Robinson, who had not yet been tried, from Erie County (Buffalo). (T. 50, 53; Pl. Exh. 17). He was called to the office of defendant Follette,

Warden of Green Haven Prison, who had the papers on his desk. The Warden asked Sostre whether he had a license to practice law, to which he replied in the negative. (T. 51). The Warden admittedly denied Sostre the right to prepare legal papers for his codefendant, since he was not a licensed attorney, and flatly refused to mail out the motion papers. (Def. Proposed Finding of Facts No. 24–25; T. 1240–1241).

At the same time, Warden Follette questioned Sostre about a reference in his letter to his attorney about an organization known as R.N.A. (Republic of New Africa) "because defendant Follette was concerned about a statement in plaintiff's May 19, 1968 letter to his sister." (Def. Proposed Finding of Fact No. 28; T. 1241–1242; Pl. Exh. 29F). This statement reads:

"As for me, there is no doubt in my mind whatsoever that I will be out soon, either by having my appeal reversed in the courts or by being liberated by the Universal Forces of Liberation. The fact that the militarists of this country are being defeated in Viet Nam and are already engaged with an escalating rebellion in this country by the oppressed Afro-American people and their white allies are sure signs that the power structure is on its way out. They are now in their last days and soon they won't be able to oppress anybody because they themselves will be before the People's courts to be punished for their crimes against humanity as were the German war criminals at Nuremberg." (Pl. Exh. 19; Def. Proposed Finding of Fact No. 28).

It is undisputed that as a result of plaintiff's refusal to cease and desist from "practicing law" in the institution, and his refusal to answer questions about R.N.A., and because of the statement in plaintiff's letter to his sister that "he would be leaving the institution soon," defendant Follette decided to

---

3. Sostre has a defense committee which is apparently working for reversal of his conviction. (Pl.Exh. 29).

place plaintiff in the punitive segregation unit. (Def. Proposed Finding of Fact No. 31; T. 1248–1249).

The proof also established: 1) plaintiff received no prior written notice of the above charges which resulted in his segregation; 2) there was no record made of the discussion with the Warden; 3) defendant McGinnis, the Commissioner of Corrections, was notified of plaintiff's confinement and the reasons therefor but took no action (T. 692–700; Pl. Exh. 29, 29A–F); 4) plaintiff was not charged with violence, attempting to escape, incitement to riot or any similar charge; and 5) plaintiff remained in segregation from June 25, 1968 until released by order of this court, more than a year later, on July 2, 1969.[4]

The parties have stipulated that as a result of solitary confinement for more than a year, Sostre has lost 124⅓ days of "good time" credit, since under the rules a prisoner in solitary cannot earn good time. [N.Y.Correction Law §§ 230, 234 (McKinney's Consol.Laws c. 43, 1968); Pl. Exh. 1 at 5, Pl. Exh. 31; Reply Brief of Def. at 20].

There is also no real dispute as to the conditions which obtained in punitive segregation during plaintiff's yearlong stay. There was only one other person incarcerated in the same group of cells as plaintiff (about four out of thirteen months) from August 14, 1968 to December 20, 1968. (Def. Proposed Finding of Fact No. 55; T. 97–98). One prisoner brought to solitary and placed in another group of cells committed suicide the next day. (T. 127–131, 400–406, 793, 839, 895–896, 905–906). Plaintiff was deprived of second portions of food (T. 887–888) and all desserts as a punishment for the entire time. (Def. Proposed Finding of Fact No. 41). He remained in his cell for 24 hours per day. He was allowed one hour per day of recreation in a small, completely en-

closed yard. Sostre refused this privilege because it was conditioned upon submission, each day to a mandatory "strip frisk" (completely naked) which included a rectal examination. (Def. Proposed Finding of Facts No. 37–38; T. 88–90). He was permitted to shower and shave with *hot* water only once a week. (Def. Proposed Finding of Fact No. 34). He was not permitted to use the prison library, read newspapers, see movies, or attend school or training programs. (T. 91–93, 96–97). He was not allowed to work. (T. 91). Prisoners in the general population who work are able to earn money with which they may purchase items from the prison commissary, or purchase books, or subscribe to newspapers. (T. 93). Prisoners in punitive segregation have access to only a few novels and "shoot-'em ups" selected for them. (T. 92–93). But, as plaintiff and defendants' counsel put it, the crux of the matter is human isolation—the loss of "group privileges." (T. 87–88, 165–166). Release from segregation is wholly within the discretion of the Warden. However, a recommendation from a non-professional, so-called, group therapy counsellor might help. (T. 134–136, 388, 773–774, 917, 921).

This court finds that punitive segregation under the conditions to which plaintiff was subjected at Green Haven is physically harsh, destructive of morale, dehumanizing in the sense that it is needlessly degrading, and dangerous to the maintenance of sanity when continued for more than a short period of time which should certainly not exceed 15 days. (T. 300, 317–320).

After plaintiff was sent to solitary confinement on June 25, 1968, his cell was searched. The Warden alleged in an affidavit filed on July 3, 1969 that the search revealed contraband. This consisted of: 1) a letter from a court belonging to another inmate (which plaintiff was translating into Spanish for that

---

4. The Warden, prior to trial, claimed that possession of the emery paper was one of the five reasons why Sostre was sent to solitary but on the trial he modified this, defendants claim, to the three reasons set forth above. (Def. Reply Brief at 8–9; T. 1248–1249).

other inmate (T. 66–67; Pl. Exh. 21); and 2) two small pieces of emery paper. (Pl. Exh. 37, at 2; T. 683–684). A Disciplinary Report dated June 25, 1968 (Pl. Exh. 22–C) records that plaintiff was reprimanded for possessing the letter. There is no similar report regarding the emery paper, although the Warden alleged both items were found at the same time. (Pl. Exh. 37, at 2). The Warden claims that the emery paper was "adaptable for the fashioning of a key or lock picking tool." (Pl. Exh. 37, at 2). Plaintiff denied ever having seen the emery paper before trial. (T. 65–67). The court believes plaintiff's testimony for the following reasons: 1) plaintiff was already in punitive segregation when the emery paper was allegedly found in his cell; 2) the Disciplinary Report of June 25, 1968 does not contain this charge (Pl. Exh. 22–C); 3) the first written recordation of any such charge against Sostre does not appear until October 29, 1968, shortly after Sostre filed his *pro se* complaint in this action on October 15, 1968 (Pl. Exh. 29–F); 4) defendants have not requested this court to make any finding with respect to the emery paper in their proposed findings of fact. On June 25, 1968, search of Sostre's cell also revealed that he was lending his law books to other inmates, after removing therefrom a stamp identifying these books (which turned out to be copies of the Harvard Law Review) as belonging to Sostre. (Follette Dep. 62–64, 117). This along with the two preceding charges was one of the charges originally put forth by defendants as a reason for Sostre's confinement but dropped upon the trial (T. 1248–1249, 683–684).

The day after plaintiff's court-ordered release from segregation, July 3, 1969, he was again disciplined. This time he was charged with having dust on his cell bars. The punishment was to confine him to his cell for several days. Again, plaintiff denied this charge, claiming he was so charged and punished in order that he would miss the regular July 4th celebration. This celebration would have brought Sostre in contact with prisoners from another part of the prison. Such contact is permitted only once a year on July 4. (T. 78–79). This court finds that this charge and punishment were imposed upon Sostre in retaliation for his legal success.

On or about August 3, 1969, plaintiff was again disciplined for having "inflammatory racist literature" in his cell. The punishment was deprivation of yard and movie privileges for 60 days. (T. 74–77, 1071–1073). The so-called "inflammatory racist literature" consisted of handwritten political articles by Sostre, some of which contained excerpts from articles printed in newspapers and magazines in general circulation in the prison (T. 72–77; Pl. Exh. 23) and lists of officers of the Black Panther Party and the Republic of New Africa, copied from similar articles in *Esquire* and other magazines. (T. 72).

All of plaintiff's letters to and from his attorney, Joan Franklin, were censored by the Warden. He excised therefrom everything which he believed was not directly related to Sostre's immediate case. (Pl. Exh. 3, 4, 7, 8, 10, 12, 13, 14, 19–23, 29–30, 33–38; Follette Dep. at 69, 70, 136, 139). And a letter to the Postal Inspector of the United States Post Office complaining about plaintiff's failure to receive receipts for certified mail was also not mailed by the Warden. (Pl. Exh. 11; T. 35).

This court finds from all of the facts and circumstances of this case, as set forth above, that Sostre was sent to punitive segregation and kept there until released by court order not because of any serious infraction of the rules of prison discipline, or even for any minor infraction, but because Sostre was being punished specially by the Warden because of his legal and Black Muslim activities during his 1952–1964 incarceration, because of his threat to file a law suit against the Warden to secure his right to unrestricted correspondence with his attorney and to aid his codefendant (T. 52; Def. Post Trial Brief at 20, 32) and because he is, unquestion-

ably, a black militant who persists in writing and expressing his militant and radical ideas in prison. (T. 71–77, 1316–1319; Pl. Exh. 23).

## I. Cruel and Unusual Punishment

Plaintiff claims that his confinement to punitive segregation for an indefinite period of time amounted to cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments to the Constitution, arising not only from the reasons for his confinement and the length of his confinement, but also from the conditions of his confinement.[5] This court agrees and so holds. *See* Wright v. McMann, 387 F.2d 519 (2d Cir. 1967).

Prisoners at Green Haven may prepare legal papers for themselves. There is no rule of the prison which prohibits inmates from preparing legal papers for their non-inmate codefendants. However, the rules do bar inmates, except upon approval of the Warden, from assisting "other inmates in the preparation of legal papers." (Pl. Exh. 1, Rule 21, Inmates' Rule Book). The Warden claims he relied upon the decision of the New York Court of Appeals in Brabson

v. Wilkins, 19 N.Y.2d 433, 280 N.Y.S.2d 561, 227 N.E.2d 383 (1967), in denying plaintiff the right to prepare and mail out a motion for his codefendant and in punishing him for this act. In *Brabson*, the majority expressly refused to follow the decision of the District Court in Johnson v. Avery, 252 F.Supp. 783 (M.D. Tenn.1966), upholding the right of a state prisoner to prepare a federal writ of habeas corpus for another state prisoner. In *Johnson*, the prisoner-plaintiff who had prepared the writ had been sent to solitary confinement. He was ordered released by the District Court. Subsequent to the filing of this law suit (October 15, 1968) the United States Supreme Court, on February 24, 1969, affirmed the District Court's decision in Johnson v. Avery, *supra*, aff'd 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), rev'ng 382 F.2d 353 (6th Cir. 1967).[6]

The fact that the Warden continued to confine Sostre to punitive segregation after the Supreme Court's decision in Johnson v. Avery, *supra*, on February 24, 1969, makes it clear that although the Warden assigned as a reason for such confinement the fact that Sostre prepared a motion for a codefend-

5. *See Generally*, Note, The Cruel and Unusual Punishment Clause and the Substantive Criminal Law, 79 Harv.L.Rev. 635 (1966).

6. Sostre filed his original complaint, *pro se*. Defendants moved to dismiss. That motion was denied by this court (Croake, J.) on February 4, 1969. Thereafter, Sostre filed another set of motion papers on April 29, 1969, in which he sought an order restraining the Warden from refusing to mail a letter for him to the United States Supreme Court, from obstructing the mailing of a "reply to this court" (presumably in the very action now decided), and from refusing to release a letter sent by plaintiff to his attorney on April 3, 1969.

Judge Tenney found on the basis of the papers before him (there was no hearing) that the Warden had neither obstructed nor interfered with any of plaintiff's letters, and denied plaintiff's motion in all respects. See order of September 19, 1969. That order was entered after the preliminary injunction issued on August 1, 1969.

In support of his decision, Judge Tenney cited the following declaration in Warden Follette's affidavit to the court of May 20, 1969 (introduced in evidence on the trial of this action, Pl. Exh. 39) : "No mail sent by plaintiff has been obstructed at any time by the staff of this institution. On the contrary, every piece of mail given by plaintiff to be mailed from this prison has been so mailed. * * *"

The affidavit continues three paragraphs later: " * * * At no time was any such correspondence [to and from plaintiff's attorney] impeded by anyone on the staff of this institution, except to examine the contents in accordance with the rules of the Department of Correction." Warden Follette testified on this trial that the affidavit was "inaccurate" (T. 1288–1292) and that it should have contained a declaration to the effect: "That no mail which he could legally mail from the prison in accordance with the New York State Department of Correction rules and with recent court decisions" had been obstructed. (T. 1290).

ant, this was not a bona fide reason for such confinement. But even if Follette did, in fact, discipline plaintiff in 1968 for preparing a motion for his codefendant in violation of the dictates of *Brabson,* this court holds that the punishment imposed upon Sostre for this offense, which was indefinite confinement to punitive segregation, was so disproportionate to the offense committed as to amount to cruel and unusual punishment. Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910); Fulwood v. Clemmer, 206 F.Supp. 370 (D.C. D.C.1962). It is clear from all of the facts in this case that but for the intervention of this court (which released Sostre from confinement after more than a year) Sostre would, in all likelihood, still be in punitive segregation for this alleged offense.

■ The Warden claimed that he assigned Sostre to punitive segregation because Sostre refused to answer "fully and truthfully" questions put to him by the Warden about the meaning of the letters R.N.A. (Pl. Exh. 1, Rule 12, Inmates' Rule Book). The court disbelieves that ambiguous claim. But even if this were true, assignment to punitive segregation for an indefinite period of time for this infraction of the rules is likewise so disproportionate to the charge, as to be clearly barred by the Eighth Amendment's prohibition against disproportionate punishment.

■■ The court also holds that the totality of the circumstances to which Sostre was subjected for more than a year was cruel and unusual punishment when tested against "the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (Opinion of Warren, C. J.). *Accord,* Jackson v. Bishop, 404 F.2d 571, 579 (8th Cir. 1968); Jordan v. Fitzharris, 257 F.Supp. 674, 679 (N.D.Cal.1966). *See* Wright v. McMann, *supra*; The American Correctional Association, Manual of Correctional Standards, 414–415 (3rd ed. 1966); The

American Law Institute, Model Penal Code § 304.7(3) (Proposed Official Draft 1962); Note, The Problems of Modern Penology: Prison Life and Prisoners' Rights, 53 Iowa L.Rev. 671, 672 (1967); (T. 511).

"[T]his condemnation of segregation is the experience years ago of people going stir crazy, especially in segregation." (T. 320). The conditions which undeniably existed in punitive segregation at Green Haven, this court finds, "could only serve to destroy completely the spirit and undermine the sanity of the prisoner," Wright v. McMann, *supra,* 387 F.2d at 526, when imposed for more than fifteen days. Subjecting a prisoner to the demonstrated risk of the loss of his sanity as punishment for any offense in prison is plainly cruel and unusual punishment as judged by present standards of decency. *Cf.* Ex parte Medley, 134 U.S. 160, 167–170, 10 S.Ct. 384, 33 L.Ed. 835 (1890). In order to be constitutional, punitive segregation as practiced in Green Haven must be limited to no more than fifteen days and may be imposed only for serious infractions of the rules.

## II. *Procedural Due Process*

Plaintiff claims that his confinement to segregation for more than a year was effected in violation of his right not to be deprived of his liberty without due process of law as guaranteed by the Fifth and Fourteenth Amendments to the Federal Constitution, in that: 1) he was sentenced to such confinement for offenses which under the rules of the prison did not constitute offenses; 2) with respect to the charge involving the emery paper there was no proof that he had such paper in his possession; 3) he did not receive advance written notice of the charges; 4) he was denied the right to assistance of counsel or a counsel substitute; 5) he was denied the right to call witnesses in rebuttal of the charges; 6) he was denied the right to confront or cross-examine witnesses; 7) there were no written records of the disciplinary proceedings against him

other than a notation of the charges, plaintiff's plea, and defendants' summary determination of guilt;[7] 8) the right to appeal and the ability to make a meaningful appeal were denied as a result of the omission of his right to counsel, to call and cross-examine witnesses, and to have a written record.

As a result of his confinement, plaintiff lost 124⅓ days of good time which might otherwise have been applied both to hasten consideration of his eligibility for parole and in mandating his release on parole. N.Y.Correction Law §§ 230, 803 (McKinney 1968).

Very recently, the Supreme Court reiterated the firmly established due process principle that where governmental action may seriously injure an individual, and the reasonableness of that action depends on fact findings, the evidence used to prove the government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. The individual must also have the right to retain counsel. The decision-maker's conclusion must rest solely on the legal rules and evidence adduced at the hearing. In this connection, the decision-maker should state the reasons for his determination and indicate the evidence upon which he relied. Finally, in such cases, the high Court ruled, an impartial decision-maker is essential. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *accord,* Escalera v. New York City Housing Authority, 425 F.2d 853 (2d Cir. 1970).

■ This court holds that plaintiff was, in effect, "sentenced" to more than a year in punitive segregation without the minimal procedural safeguards required for the imposition of such drastic punishment upon a prisoner. This punishment not only caused plaintiff physical deprivation, needless degradation, loss of work, training and self improve-ment opportunities, and mental suffering, but materially affected the length of time he must serve under his court-imposed sentence.

■ Before plaintiff could have been constitutionally "sentenced" to punitive segregation, he was entitled to: 1) written notice of the charges against him (in advance of a hearing) which designated the prison rule violated; 2) a hearing before an impartial official at which he had the right to cross-examine his accusers and call witnesses in rebuttal; 3) a written record of the hearing, decision, reasons therefor and evidence relied upon; and 4) retain counsel or a counsel substitute.

■ A prisoner carries with him to prison his right to procedural due process which applies to charges for which he may receive punitive segregation or any other punishment for which earned good time credit may be revoked or the opportunity to earn good time credit is denied. There is no place in our system of law for reaching the result which occurred here without the safeguards listed above. Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967); In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); Kent v. United States, 383 U.S. 541, 554, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966); Hewett v. State of North Carolina, 415 F.2d 1316 (4th Cir. 1969); Shone v. State of Maine, 406 F.2d 844 (1st Cir.), vacated as moot, 396 U.S. 6, 90 S.Ct. 25, 24 L.Ed.2d 6 (1969); *cf.* Talley v. Shephens, 247 F.Supp. 683, 689 (E.D.Ark.1965).* Prisoners do not lose all of their rights under the Constitution when sentenced to prison. Washington v. Lee, 263 F.Supp. 327 (M.D.Ala.1966), aff'd per curiam, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); Sostre v. McGinnis, 334 F.2d 906 (2d Cir.), cert. den., 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 (1964); Pierce, Sostre, Sa Marion v. La Vallee, 293 F.2d

---

7. Pl.Exh. 22C, F, and G.

* In the related case of Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968), the Eighth

Circuit instructed the district court to enjoin *any* use of the strap.

233 (2d Cir. 1961). And basic constitutional rights cannot be sacrificed, even in the case of prisoners, "in the interest of administrative efficiency." United States ex rel. Marcial v. Fay, 247 F.2d 662, 669 (2d Cir. 1957), cert. denied, 355 U.S. 915, 78 S.Ct. 342, 2 L.Ed.2d 274 (1958); Burns v. Swenson, 288 F.Supp. 4 (W.D.Mo.1968), modified, 300 F.Supp. 759 (W.D.Mo.1969). *See* President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections 82–83 (1967); President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 181 (1967). *See also* Barkin, The Emergence of Correctional Law and the Awareness of the Rights of the Convicted, 45 Neb.L.Rev. 669 (1966); The American Law Institute, Model Penal Code § 304.7(2) (Proposed Official Draft 1962).

### III. *Access to Courts and Public Officials*

█ The refusal to mail the certificate of reasonable doubt immediately after plaintiff arrived at Attica and immediately after his arrival at Green Haven was not such an unreasonable restriction of plaintiff's rights as to require a finding of unconstitutional action by defendants in this respect. The certificate of reasonable doubt was mailed shortly after plaintiff's arrival at Green Haven. Apparently, the few days involved did not defeat plaintiff's right to file such a certificate, since no claim is made that the delay interfered with the timeliness of its filing.

█ There is no question that defendants cannot unreasonably restrict the right of plaintiff to apply to the state court for relief. *Cf.* Johnson v. Avery, *supra*; Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941). "[A] right of access to the courts is one of the rights a prisoner clearly retains. It is a precious right, and its administratively unfettered exercise may be of incalculable importance in the protection of rights even more precious." Coleman v.

Peyton, 362 F.2d 905, 907 (4th Cir.), cert. den., 385 U.S. 905, 87 S.Ct. 216, 17 L.Ed.2d 135 (1966). *See* Stiltner v. Rhay, 322 F.2d 314, 316 (9th Cir. 1963), cert. den. sub nom., Stiltner v. Washington, 376 U.S. 920, 84 S.Ct. 678, 11 L.Ed. 2d 615 (1964).

Warden Follette censored mail to and from plaintiff's counsel by excising therefrom whatever, in his judgment, was not relevant to plaintiff's case. In support of his position, the Warden relies upon Brabson v. Wilkins, 19 N.Y.2d 433, 280 N.Y.S.2d 561, 227 N.E.2d 383 (1967), which upheld the right of the prior Warden at Attica Prison to intercept and withhold from a prisoner communications to and from an attorney dealing with matters other than "legality of detention and treatment received." In short, the prisoner could write to his attorney about legal matters and treatment only. *Brabson, supra*, at 437, 280 N.Y.S.2d 561, 227 N.E.2d 383. The court in *Brabson* had also limited the prisoner's right to write to executive officials to "complaints of unlawful treatment", but it placed no limitation on anything written to a court by a prisoner. *Id.*

Plaintiff contends that defendants' arbitrary and capricious action with respect to his correspondence with his attorney violated not only his Fourteenth Amendment right as recognized by the case law but also his Sixth Amendment right to the effective assistance of counsel.

█ This court agrees with, and adopts, the holding and rationale of the three dissenting judges (Keating, Fuld, Van Voorhis) in *Brabson, supra*. Judge Keating, who wrote the dissenting opinion, said:

> I believe that these limitations as well as the authority given the Warden unnecessarily interfere with and endanger this prisoner's right to communicate with his attorney and governmental officials having either jurisdiction over the penal system or the power and authority to correct conditions existing therein. * * *

\* \* \* \* \* \*

\* \* \* Judges and courts are not the only persons or agencies capable of granting relief to prisoners complaining about the illegality of their treatment or detention. For this reason, I see no basis for distinguishing between letters to courts, to the prisoner's attorney or to government officials. In all of these cases only the recipients of the letters should be permitted to determine whether the contents warrant their intervention and not the very person whose jurisdiction and conduct are being questioned.

\* \* \* \* \* \*

Exactly how the exercise of this right will undermine prison discipline and authority is not made clear. The Attorney General alleges that "prisoners would be able to carry on unauthorized activities through communications from prisoners to their attorneys and thence to third parties." Uncensored communications, however, presently occur on personal visits to the prison by the prisoner's attorney and members of his family, without any apparent undermining of prison discipline. In any event, the right of a prisoner to unexpurgated communications with his attorney is so significant that it outweighs the danger of frustration of prison rules regarding outside activities in the rare case where an attorney—an officer of the court—would assist a prisoner in avoiding legitimate prison regulations.

Judge Keating then went on to reiterate, as other courts had, that prisoners do retain certain constitutional rights in prison:

The right of an individual to seek relief from illegal treatment or to complain about unlawful conduct does not end when the doors of a prison close behind him. True it is that a person sentenced to a period of confinement in a penal institution is necessarily deprived of many personal liberties. Yet there are certain rights so necessary and essential to prevent the abuse of power and illegal conduct that not even a prison sentence can annul them. As this court once observed, "An individual, once validly convicted and placed under the jurisdiction of the Department of Correction \* \* \*, is not to be divested of all the rights and unalterably abandoned and forgotten by the remainder of society." (People ex rel. Brown v. Johnston, 9 N.Y.2d 482, 485, 215 N.Y.S.2d 44, 46, 174 N.E.2d 725, 726.)

Among the rights of which he may not be deprived is the right to communicate, without interference, with officers of the court and governmental officials; with those persons capable of responding to calls for assistance. No valid reason, other than the shibboleth of prison discipline, has been advanced for the denial of this right in the case before us. I believe that courts should look behind inappropriate slogans so often offered up as excuses for ignoring or abridging the constitutional rights of our citizens.

19 N.Y.2d at 438, 440, 280 N.Y.S.2d at 564, 565, 566, 227 N.E.2d at 385, 386. *See also*, Fulwood v. Clemmer, 206 F. Supp. 370, 376 (D.C.D.C.1962); Burns v. Swenson, 300 F.Supp. 759, 762 (W.D.Mo. 1969).

██ For the foregoing reasons, Warden Follette's refusal to mail plaintiff's letter to the United States Postal Inspector was also improper.

## IV. *Freedom of Political Expression*

About a month after this court ordered plaintiff's release from solitary confinement on July 2, 1969, plaintiff was charged with the possession of contraband found in his cell. This consisted of political literature, such as a list of officers of the Black Panther Party and Republic of New Africa, and "Revolutionary Thoughts" put on paper by plaintiff. Some of this matter was copied from newspapers and magazines which had been legally and regularly circulated in the prison. (T. 71–77; Pl. Exh. 23). This information was characterized by the Deputy Warden as racist and, con-

sequently, contraband. (T. 1071–1073). The Deputy Warden found plaintiff guilty of possession of such contraband and punished him by the denial of 60 days of yard time and movies. (T. 1071–1072; Pl. Exh. 29 E). This action on the part of defendants must be considered in conjunction with the Warden's sending Sostre to solitary confinement initially because of the statement made in the letter to his sister and because of Sostre's refusal to answer questions about R.N.A. Thus considered, there is no room for doubt that Sostre's troubles with defendants stem not from his acts or threats to prison security, but from his political thoughts and beliefs, as expressed in the literature he reads and the letters he writes. (Pl. Exh. 29, 29A—29E). Sostre was not charged with organizing a chapter of R.N.A. in prison, making inflammatory racist speeches to other prisoners, or urging revolt by inmates against prison officials prior or subsequent to being sent to punitive segregation. Sostre had been previously sent to segregation because of something he had *written* to his sister and because of his refusal to answer questions about a political organization. And even the August 3, 1969 charge was that of mere possession of "racist" literature.

The First Amendment to the Constitution is a guarantee that freedom of the mind shall have the same protection as freedom of religion and that "[g]reat secular causes, with small ones, are guarded" against unreasonable governmental infringement. Thomas v. Collins, 323 U.S. 516, 531, 65 S.Ct. 315, 323, 89 L.Ed. 430 (1945). The question, therefore, is whether a prisoner sentenced to a state prison carries with him his First Amendment rights to freedom of speech, i. e., freedom of political thought and writing guaranteed against state infringement by the Fourteenth Amendment to the Federal Constitution. The Sixth Circuit has written: "A prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law." Coffin v. Reichard, 143 F.2d 443,

445 (6th Cir. 1944). There the court held that a prisoner retains his right to personal security against unlawful invasion. And the Court of Appeals of this Circuit as well as other Circuit Courts have recognized the right of prisoners to religious liberty guaranteed by the First and Fourteenth Amendments against unreasonable restrictions of prison officials. *See, e. g.,* Sostre v. McGinnis, 334 F.2d 906 (2d Cir.), cert. den., 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed. 2d 96 (1964); Pierce, Sostre, Sa Marion v. La Vallee, 293 F.2d 233 (2d Cir. 1961); Long v. Parker, 390 F.2d 816 (3rd Cir. 1968); Cooper v. Pate, 382 F. 2d 518 (7th Cir. 1967); Barnett v. Rodgers, 133 U.S.App.D.C. 296, 410 F.2d 995 (1969). Other cases, cited and discussed above, make clear that a prisoner retains his right to access to the courts, freedom from cruel and unusual punishment, and certain procedural due process rights. The right to freedom of political thought and expression is also among those rights which a prisoner takes with him to prison (subject to reasonable rules and regulations necessary to maintain prison discipline) since, as the court reminded us in *La Vallee, supra,* 293 F. 2d at 235, when we talk about First Amendment rights we are talking about "preferred" constitutional rights.

Follette claims that he put Sostre in punitive segregation because he feared that Sostre would break out of prison. (T. 1241–1242). The Warden's evidence for such a significant conclusion was Sostre's letter to his sister. This court finds that the statements in Sostre's letter to his sister, *supra,* cannot properly be construed as a threat to escape from prison. The letter affirmed Sostre's belief that he would be released through legal process; the remainder was sheer political hyperbole. The undisputed evidence established that shortly before trial defendants voluntarily transferred plaintiff to another state prison, Wallkill, where he would be nearer his attorney for purposes of preparing for trial. At Wallkill, Sostre has been permitted to help organize a Black Studies

program, an Afro-American Cultural Society and an Afro-Asian Book Shop. He is able to read, share his books, obtain books and possess political literature of the very kind for which he was punished at Green Haven. (T. 140–143, 276, 1307–1310). As a matter of fact, the undisputed testimony was that the Warden at Wallkill had approved Sostre's Afro-American Society program and was seeking professional help for Sostre in setting up the program as a model for other prisons. (T. 143).

■■■ The court, therefore, finds that Sostre's writings, refusal to answer questions about a political organization, and possession of political literature in the prison before and since his commitment to punitive segregation, whether considered singly or together, neither caused any disturbance or security risk nor provided the basis for any reasonable apprehension of such disturbance or security risk in the minds of the prison officials. (Pl. Exh. 29, 29A—29E).

The Second Circuit said in Pierce, Sostre, SaMarion v. La Vallee, *supra*, at 235, that a prisoner may not be punished solely because of his religious beliefs. Under the rationale of Johnson v. Avery, *supra*, a man may not be punished for reasonably exercising his First Amendment rights, as here, or any other federally protected right. It is not a function of our prison system to make prisoners conform in their political thought and belief to ideas acceptable to their jailers. On the other hand, one function is to try to rehabilitate the lawbreaker by convincing him of the validity of our legal system. There is little chance that such an objective will be achieved if prisoners are entrusted to those who likewise break the law by denying prisoners their basic constitutional rights. This court holds that Sostre's confinement to punitive segregation for the letters he wrote and for refusal to answer questions about a political organization, and his subsequent punishment for mere possession of political literature, were unreasonable punishments and violated his First Amend-

ment right to freedom of political expression.

## V. *Racial Discrimination in the Operation of State Prisons*

Plaintiff alleged in his complaint that the defendant Governor of New York, the defendant Commissioner of Corrections, and the two defendant Wardens "together with unknown others, did, at a time prior to the filing of the original complaint in this action, join and engage in an unlawful conspiracy to deprive plaintiff and other prisoners of black and other non-Caucasian races of their rights under the Thirteenth and Fourteenth Amendments to the Constitution." (Amended Complaint, para. 18). In support of the conspiracy allegation, the complaint alleges that defendants are administering the prisons in the State of New York in a racially discriminatory fashion since, despite the fact that over 70% of the inmates in the state prison system are non-whites, only 2% of the entire guard force in the prisons is composed of blacks or Puerto Ricans; and these few are assigned to inferior positions. There are not, nor have there ever been, according to the complaint, non-white wardens or deputy wardens or commissioners or deputy commissioners of corrections. At Attica Prison, under the direction and control of defendant Mancusi, it is alleged, there is a non-white population of 75% of all inmates but only one or two non-white guards. Plaintiff alleges that as a result of the foregoing facts, non-white prisoners, and especially Afro-American prisoners, are subject to discrimination, persecution, and denial of their basic human rights, and the badges and incidents of slavery in violation of the Thirteenth and Fourteenth Amendments. (Amended Complaint, para. 20, 21).

■■■ Plaintiff, of course, has standing to challenge any racially discriminatory practices pursued by state officials in the state's prisons where he resides and is subject to reside. Washington v. Lee, 263 F.Supp. 327 (M.D.Ala.

1966), aff'd per curiam, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). However, plaintiff has failed to carry his burden of proving, by a fair preponderance of the evidence, that the paltry number of non-white guards and other personnel, acknowledged by defendants, resulted from racial discrimination against qualified applicants or a conspiracy to deny blacks and Puerto Ricans their rights.

Defendants claimed that wardens, guards and other prison personnel are appointed pursuant to the state's civil service system. Plaintiff offered no proof to rebut this assertion. Defendants also claimed that the low percentage of non-white personnel at certain prisons —including Green Haven and Attica—results from the fact that they are located in upstate rural areas where there are relatively few non-whites and Puerto Ricans. Non-whites and Puerto Ricans, therefore, have not applied for positions in those upstate prisons despite campaigns of recruitment, preferring assignment to Sing Sing Prison which is nearer to New York City. Plaintiff again offered no proof to rebut this assertion.

As to the situation at Green Haven, plaintiff, himself, testified that just after this suit was commenced, a few new non-whites were added to the guard staff. (T. 1317–1318). From this evidence it may be inferred that plaintiff's claim is correct; but this evidence also tends to sustain defendants' claim that they have been trying to recruit more non-whites. In this connection, it should be noted that the prison doctor at Green Haven, who testified upon the trial, was a black man. This, again, tends to support defendants' claim of non-discrimination. In any event, in the absence of a fair preponderance of proof of discrimination or proof of failure to specially re-cruit, no relief can be granted as to this claim. The court does not understand defendants to dispute their duty to remedy the distorted situation by programs of special recruitment. The third cause of action is, therefore, dismissed as to all parties. Since Governor Rockefeller was named only in this third cause of action, relating to this alleged conspiracy, and plaintiff's case completely fails as to him, this case as to him is dismissed.[8]

## VI. Jurisdiction

Despite the language of the Second Circuit in Wright v. McMann, 387 F.2d 519 (1967), squarely upholding jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3), in a suit for injunction and damages against Daniel McMann, as Warden of Clinton State Prison, defendants claim that this court is wholly without jurisdiction of the instant suit for the same relief because it is admittedly brought against defendants in their official capacities as opposed to their individual capacities.[9] It is, therefore, defendants say, a suit against the state, long since barred by the Eleventh Amendment. In addition, defendants claim that the Civil Rights Acts did not repeal the Eleventh Amendment and, consequently, a state is not a person within the meaning of Section 1983. In this connection, defendants called to the court's attention a recent Second Circuit case, Zuckerman v. Appellate Division, etc., 421 F.2d 625 (1970), in which the court held that the Appellate Division, a New York State court, is not a "person" within the meaning of 42 U.S.C. § 1983. In so holding, the court relied upon Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), which held that a municipality is not a "person" within Section 1983, and Williford v. California, 352 F.2d 474 (9th

8. The case is not dismissed as to any of the remaining defendants. The Commissioner has the power to re-transfer Sostre to Attica Prison, where defendant Mancusi is the Warden. Defendant McGinnis is the chief executive officer of the state's prison system. He was made aware of everything which was happening to Sostre by Warden Follette. (T. 692–700; Pl. Exh. 29, 29–A–F). Although he had the power to do so, McGinnis took no action with respect to Sostre's confinement or the conditions in punitive segregation at Green Haven. Therefore, the case is not dismissed as to him.

9. Amended Complaint, para 4; T. 703–704.

Cir. 1965), holding that a state is not a "person" within the contemplation of Section 1983. Defendants, relying upon *Zuckerman*, argue that since plaintiff admits that his suit against defendants in their official capacities is, in reality, a suit against the State, the court is likewise without jurisdiction under Section 1983. 28 U.S.C. § 1343(3).[10]

Plaintiff has not sued the State of New York as did the plaintiff in Williford v. California, *supra*, or any part of the judicial arm of the State as was the case in *Zuckerman*.[11] Plaintiff has sued individuals, only, as state officers. The question, therefore, is whether state officers, *qua* state officers, are amenable to suits for injunction and damages under Section 1983.

The Eleventh Amendment to the Federal Constitution has been construed as prohibiting a suit by a citizen of a state against the state of which he is a citizen without its consent. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); Parden v. Terminal R. of Alabama State Docks Dept., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964) (dictum).

The Fourteenth Amendment, on the other hand, provides that, " * * * No State shall * * * deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Section 1.

As a result, enforcement of the Fourteenth Amendment has involved the Supreme Court in historic attempts to reconcile its construction of the Eleventh Amendment with the unequivocal prohibitions of the Fourteenth Amendment.

## A. The Eleventh Amendment

Ever since Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)

state attorneys general and other state officials have been regularly enjoined from enforcing state statutes which violate the Fourteenth Amendment, despite the Eleventh Amendment, as a result of a Court-made fiction. This fiction has lived on, despite the Court's own immutable view that the Fourteenth Amendment is applicable only to state action and not private action. C. Wright, Law of Federal Courts § 48 (2d ed. 1970). K. Davis, 3 Administrative Law Treatise §§ 27.01, 27.10 (Supp.1965). The Court in Ex parte Young rationalized that, when a state official seeks to enforce a state statute which violates a prohibition of the Fourteenth Amendment, he is in that case stripped of his official character, and is subject in his person to the consequences of his individual conduct, since a state cannot act unconstitutionally. In other words, as one writer has noted, the Court created the anomaly that enforcement of an unconstitutional state statute is state action for the purposes of the Fourteenth Amendment, but individual action for the purposes of the Eleventh Amendment. C. Wright, *supra*, at 159.

Five years after Ex parte Young, in Home Telephone & Telegraph Co. v. City of Los Angeles, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510 (1913), a suit for injunction against a city to enjoin enforcement of a municipal ordinance on Fourteenth Amendment grounds, the Court made clear that a state official or agency is subject to suit in his or its official capacity for purposes of the Fourteenth Amendment. It ruled: " * * * the provisions of the Amendment as conclusively fixed by previous decisions are generic in their terms, are addressed, of course, to the states, but also to every person, whether natural or juridical, who is the respository of state power." *Id.* at 286, 33 S.Ct. at 314.

---

10. It should be noted that the Amended Complaint also predicates jurisdiction on 28 U.S.C. § 1331. (Amended Complaint, para. 1).

11. *But see* Law Students Civil Rights Research Council, Inc. v. Wadmond, 299 F.

Supp. 117 (S.D.N.Y.1969) (three-judge court) where the court held that the Appellate Division judges may be enjoined from enforcing an unconstitutional state statute. *Id.* at 123.

The Court then went on to say that the Amendment's applicability is not limited to those persons who are acting pursuant to state statute but extends as well to those who exceed their authority. *Id.* at 287, 33 S.Ct. 312. Again, the Court was making it absolutely clear that the Amendment is concerned only with exertion of state power in every form and not with private action and, therefore, to be enforcible the Amendment must be made applicable to state officials acting in their official capacities, whether the action taken by them is authorized or not.

In Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), the Court, once again, reaffirmed that the Fourteenth Amendment reaches and controls state officials *in their official capacities*. In reiterating earlier Court holdings that the Amendment applies to the action of a state court the Court said: "A State acts by its legislative, its executive, or its judicial authorities. *It can act in no other way*." (Emphasis added). *Id.* at 14, 68 S.Ct. at 842 [citing Ex parte Virginia, 100 U.S. 339, 347, 25 L.Ed. 676 (1880)].

■ If there is any doubt left as to whether violations of the Fourteenth Amendment by state officers or agencies, acting in their official capacities, may be enjoined by the federal courts, one need only turn to Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and its progeny, *e. g.*, Wells v. Rockefeller, 273 F.Supp. 984 (S.D.N.Y.), aff'd 389 U.S. 421, 88 S.Ct. 578, 19 L.Ed. 2d 651 (1967). In the *Wells* case, a suit for injunction to enjoin enforcement of New York's congressional redistricting statute, the Governor, the Attorney General, the Secretary of State, the Lieutenant Governor, and the Presiding Officers of both the Senate and the Assembly of the State of New York were all sued in their official capacities and ordered by the District Court to "enact into law a congressional districting plan, * * * which * * * shall be in conformity with the redistricting princi-

ples * * * " announced by the Court in Baker v. Carr, *supra*. Wells v. Rockefeller, 281 F.Supp. 821, 822 (1968).

■ Then if there is any doubt as to whether a federal court can award damages against state officials in their official capacities, despite the Eleventh Amendment, see Thompson v. Shapiro, 270 F.Supp. 331 (D.Conn.1967), aff'd 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) ordering payments unconstitutionally withheld from a welfare recipient to be paid by the State Welfare Commissioner. *But see* Westberry v. Fisher, 309 F.Supp. 12 (D.Me.1970).

In *Westberry*, the District Court held that the Eleventh Amendment prohibited welfare recipients from suing the State Welfare Commissioner in his official capacity for damages. The court conceded that the Fourteenth Amendment and Section 1983's enforcement of that Amendment supercedes the Eleventh Amendment in equitable actions, but ruled that such a doctrine should not be extended to damage actions because actions at law would affect state treasuries. This court does not agree with the District Court's analysis in *Westberry* because it does not take into account the effect which the vast equity powers of a federal court may have upon state treasuries in enforcing the Fourteenth Amendment, as demonstrated by Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 1256 (1964). In *Griffin*, after rejecting the Eleventh Amendment argument, the Court held that it would be proper to force the reopening of public schools in Prince Edward County by "requir[ing] the Supervisors to exercise the power that is theirs to levy taxes to raise funds adequate to reopen, operate, and maintain * * * a public school system" of that county. *Id.* at 233, 84 S.Ct. at 1234.

An injunction that tells a state agency how it *must* collect and spend its money manifestly affects a state's treasury. Certainly, if the extraordi-

nary remedy of an injunction can be used against a state to carry out the mandate of the Fourteenth Amendment, then the ordinary remedies at law can be used.

From a practical point of view, a state official or a state commission or a state agency, and not the political entity called a state or one of its political subdivisions, must be before the court since, as the Supreme Court has already noted, a state can act only through its agents, it can act in no other way. This concept of state action has manifest practical judicial considerations embodied in it. If an order is simply issued against a state, who is responsible? Is it the governor, the legislature, the judiciary? How is an injunction against a state enforced? Who is brought in on contempt proceedings for failure to comply with a damage award? Clearly, unless some state official or agency is specifically enjoined it is difficult to see how such an injunction can be enforced. *See, e. g.*, United States v. Mississippi, 380 U.S. 128, 141–142, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965). The same is also true with respect to a judgment for damages. If the judgment runs against a state *qua* state, or a municipality, as opposed to one of its officials or agencies, how is that judgment enforced?

B. *Section 1983 Actions*

In Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Court held: " * * * that Congress has the power to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." *Id.* at 171–172, 81 S.Ct. at 476. It then held that Congress, in enacting Section 1983, meant to give a remedy to parties deprived of constitutional rights "by an official's abuse of his position." *Id.* at 172, 81 S.Ct. at 476.

42 U.S.C. § 1983 provides:

*Civil action for deprivation of rights*
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

In Monroe v. Pape, *supra*, at 187, 81 S.Ct. 473, the Court adhered to the definition of the words "under color of" state law as formulated in United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941) (in construing 18 U.S.C. § 242), and applied it to Section 1983:

"Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law."

365 U.S. at 184, 81 S.Ct. at 482.

■ It expressly rejected, once again, the contention that the phrase "under color of" state law included only action taken by officials pursuant to state law. *Id.* at 184, 185, 81 S.Ct. 473. The phrase, therefore, includes action taken by state officials without state authorization. *Accord*, Kerr v. City of Chicago, 424 F.2d 1134 (7th Cir. 1970).

The Court in *Monroe* also ruled that Section 1983: " * * * should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Id.* at 187, 81 S.Ct. at 484.

Finally, with respect to whether a municipality is a "person" within the meaning of Section 1983, the Court held: "The response of the Congress to the proposal to make municipalities liable for certain actions being brought within federal purview by * * * [§ 1983], was so antagonistic that we cannot believe

that the word 'person' was used in this particular Act to include them." *Id.* at 191, 81 S.Ct. at 486.[12] The legislative history upon which this definition of "person" was based, revealed that " 'the House had solemnly decided that in their judgment Congress had no constitutional power to impose any obligation upon county and town organizations, the mere instrumentality for the administration of state law.' " *Id.* at 190, 81 S.Ct. at 485 [quoting from Cong.Globe, 42nd Cong., 1st Sess. 804]. That statement can be read to mean that the House believed that although Congress could impose a liability on the states to respond in damages, as the principal, it could not impose any such liability upon "the mere instrumentality for the administration of state law." The Court expressly did not reach the policy considerations underlying the opposite result, such as the need for responsible defendants in suits against police officers. *Id.* at 191, 81 S.Ct. 473. And, most significantly for the instant case, it ·did *not* "reach the constitutional question whether Congress has the *power* to make municipalities liable for acts of its officers that violate the civil rights of individuals." *Id.* at 191, 81 S.Ct. at 486 (Emphasis added).

█ In this case, however, we are not dealing with a municipality. We are dealing with state executive officials. It is clear that state officials, *qua* state officials, are "persons" within the contemplation of Section 1983 because, as the Court said in *Monroe*, the purpose of that Section is to provide a remedy against "state officials" who abuse their power. And the Second Circuit said in Eisen v. Eastman, 421 F.2d 560, 562–563 (2d Cir. 1969): "Actions against a governmental official acting 'under color of'

statutes and ordinances are what 42 U.S. C. § 1983 is mainly about."

█ The instant suit is an action alleging deprivations of civil rights—it is one wherein the rights and immunities are those comprising personal liberty, not dependent for their existence upon the infringement of property rights. Eisen v. Eastman, *supra*, at 564. Therefore, this case falls squarely within the contemplation of Section 1983 and this court thus not only has jurisdiction, 28 U.S.C. § 1343(3), but the power, in a jurisdictional sense, to grant both equitable and legal relief.

The instant suit also predicates jurisdiction in this court on 28 U.S.C. § 1331, the general federal question jurisdiction statute. In Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946) the Court held: "And it is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution and to restrain individual state officers from doing what the 14th Amendment forbids the state to do. Moreover, where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Id.* at 684, 66 S.Ct. at 777.

### C. *Exhaustion of Administrative Remedies*

█ The State has not seen fit to provide a plain, speedy and adequate administrative remedy in a case of this kind. The only administrative remedy which Sostre had was to write a letter to the Commissioner.[13] However, this

12. But as pointed out above, an injunctive order or judgment for damages may be unenforceable without a specific agent or agency against whom such order or judgment may be enforced.

13. The Second Circuit's recent requirement set forth in dicta in Eisen v. Eastman, *supra*, of exhaustion of an "adequate" administrative remedy in an action properly brought under Section

1983, is apparently reached without taking judicial notice of the fact that the Supreme Court's decisions (which it cites in that opinion) which hold that state administrative remedies need not be exhausted before resort to a federal court under Section 1983, did not so hold without long and careful consideration of the effect of the exhaustion doctrine upon civil rights cases. Comment, Section

would have been futile since the evidence shows that soon after Sostre was placed in punitive segregation the Warden, himself, advised the Commissioner of his actions with respect to Sostre. This was in early July 1968. (T. 699). From March 1968 to October 1968, the Warden sent memoranda and letters to the Commissioner revealing his actions with respect to Sostre (Pl. Exh. 29, 29A–29F). There had been an inspector from the Commissioner's office at the prison in September 1968 who made a special memorandum to the file on conditions in punitive segregation at Green Haven. (Def. Exh. BB; T. 1163–1164). There was also a general report in September 1968 regarding conditions at Green Haven to the Commissioner (Def. Exh. AA) which also reported on conditions in segregation. The Commissioner took no action with regard to Sostre or the conditions in punitive segregation until after Sostre filed his pro se complaint on October 15, 1968. The Commissioner then sent to the Warden a letter which had been written to

him by a private citizen on behalf of Sostre in which he requested the Warden to "give [him] complete information so that [he] may be in a position to more adequately answer [the] inquiry." (Pl. Exh. 30). There is no dispute that the Commissioner was fully advised of the treatment afforded Sostre and of Sostre's condition in segregation but never took any action. (T. 700).

The Second Circuit said in Eisen v. Eastman, *supra*, 421 F.2d at 569, that exhaustion of state administrative remedies is not required in actions under Section 1983 where the administrative remedy is inadequate or where it is certainly or probably futile, citing Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968). In this case, as in *Houghton*, the defendants, including the Commissioner, take the position that the rules were validly and correctly applied to petitioner. The only recourse available to plaintiff was to write a letter to the Commissioner, the very person to whom the Warden had already reported and who takes this po-

1983 Jurisdiction: A Reply, 83 Harv.L. Rev. 1352, 1358 (1970); Note, Limiting the Section 1983 Action in the Wake of Monroe v. Pape, 82 Harv.L.Rev. 1486, 1498–1501 (1969). The requirement of exhaustion of administrative remedies is a doctrine of judicial administration founded upon a desire to have an efficient administration of justice. C. Wright, Federal Courts § 59 (2d ed. 1970). The doctrine was originally limited to rate making cases. And as a result of this doctrine, the federal courts avoided a flood of tedious and burdensome litigation without any significant damage to the petitioners.

Soon after federal jurisdiction was successfully invoked in what was to usher in four decades of litigation in the federal courts to secure for American Negroes those rights guaranteed them by the Constitution and laws of the United States, Alston v. School Board of City of Norfolk, 112 F.2d 992 (4th Cir.), cert. den. 311 U.S. 693, 61 S.Ct. 75, 85 L.Ed. 448 (1940), the doctrine of exhaustion of administrative remedies was applied to such cases. Cook v. Davis, 178 F.2d 595 (5th Cir. 1949), cert. den. 340 U.S. 811, 71 S.Ct. 38, 95 L.Ed. 596 (1950); Bates v. Batte, 187 F.2d 142

(5th Cir.), cert. den. 342 U.S. 815, 72 S.Ct. 29, 96 L.Ed. 616 (1951); Carson v. Board of Education of McDowell County, 227 F.2d 789 (4th Cir. 1955), mandamus denied on same ground sub nom. Carson v. Warlick, 238 F.2d 724 (4th Cir. 1956), cert. den. 353 U.S. 910, 77 S.Ct. 665, 1 L.Ed.2d 664 (1957). This frustrating roadblock to the federal courts in civil rights cases was finally removed by the Supreme Court in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), more than a decade after Cook v. Davis, *supra*, during which the requirement became increasingly more burdensome. Carson v. Warlick, *supra*. Comment, Exhaustion of State Remedies Under The Civil Rights Act, 68 Colum.L.Rev. 1201, 1207 & n. 42 (1968). The cost to petitioners of these resultant delays can be seen in Griffin v. County School Board, Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), where, when the case reached the Supreme Court, the public schools had already been closed for 5 years. This is hardly the time for another retreat from prompt federal enforcement of civil rights and personal liberties.

sition. In a case such as this, where the person with the power to act has already been informed of the facts, it would be "to demand a futile act" to require an aggrieved person to first appeal to such person before resorting to a federal court for relief.[14] *Houghton* at 640, 88 S.Ct. 2119.

14. The commissioner of correction is the chief executive officer of the department of correction and is in sole charge of the administration of that department. N.Y. Correction Law § 5 (McKinney 1968). He appoints the warden of each state prison, who is subject to the rules and statutory powers of the commissioner and who, in directing the officers and employees in his prison, is also subject to the direction of the commissioner. *Id.* § 18.

The commissioner is also chairman of the state commission of correction, which is charged with the visitation and inspection of state prisons. N.Y. Correction Law § 16(1), (2) (McKinney 1968). Specifically, and of most importance here:

> The state commission of correction shall visit and inspect all institutions used for the detention of sane adults * * * convicted of crime, * * * and, *subject to the direction and control of the commissioner of correction*, shall:
> 1. Aid in securing the just, humane and economic administration of all institutions subject to its supervision.
> * * * * *
> 5. Secure the best sanitary conditions * * *, and protect and preserve the health of the inmates.

*Id.* § 46 (Emphasis added).

There is no plain, adequate or speedy administrative remedy whereby a prisoner sent to punitive segregation for an alleged infraction of the rules may have his grievance remedied nor is there such a remedy for claims of racial segregation, as here alleged. If an inmate believes an order to be unjust or has any complaint concerning an order or desires to complain concerning any action, he notifies a staff officer who notifies the Principal Keeper at the earliest opportunity. (Rule 5, Inmates' Rule Book, Pl. Exh. 1). "The rule book states that he can address himself to the deputy warden, the warden, and he may ask for and receive a letterhead to send a letter to the Commissioner." (Follette Dep. at 147, Pl.Exh. 38A; T. 1244).

When an inmate violates a prison rule, it is reported by an officer to the deputy warden. (Follette Dep. at 10, Pl.Exh. 38B). The deputy warden speaks to the inmate in the presence of a sergeant and perhaps other officers, but the inmate has no opportunity to confront his accuser. The Warden testified: It "would be degrading to the officer" to have him present. (Follette Dep. at 12–13, Pl. Exh. 38B).

The defendant Commissioner furnished the following information under oath:

> 4. * * * There is also a Review Board in the Central Office of the Department of Correction that reviews all cases involving infractions of rules and punishment where such punishment is 30 days or more. The Review Board is authorized to judge the determination made by the warden in all inmate *disciplinary matters.*
> * * * * *
> 7. * * * [A]ll punishment which is imposed in excess of 30 days or where a privilege is withheld for 30 days or more must be referred to the Commissioner. By this means we standardize as much as possible punishments for a similar violation in all of the institutions.

Answer to Interrogatories of Paul D. McGinnis, Pl.Exh. 28 at 2, 3.

There is no codified regulation or provision creating a Review Board, nor is there any indication of what procedures, if any, are followed by any such Board. Warden Follette was explicitly questioned as to whether a Review Board had been set up in Sostre's case. He testified that he did not know if one had been set up, and that no one "communicated with [him] on the Sostre case as to his confinement in segregation." (T. 700).

Moreover, defendants do not claim that Sostre's confinement in segregation was in fact reviewed by the Commissioner. In rebutting plaintiff's claim that he had no right of appeal from the disciplinary proceeding, defendants merely point to a rule which permits a prisoner to write a letter requesting an audience with the Warden or Commissioner of Correction. (Reply Brief of Defendants at 32, citing Rule 14, Inmates' Rule Book, Pl.Exh. 1).

Where a prison board withholds the allowance of reduction of sentence for good time, such action must be reported to the commissioner of correction with reasons therefor. N.Y. Correction Law § 236 (McKinney 1968); 7 N.Y.Codes, Rules & Regulations, Correction § 60.4 (e) (1963) [hereinafter referred to as

## VII. *Injunctive Relief*

■ The cases in which injunctions have been issued against state officials for violating Fourteenth Amendment rights in the last two decades are legion. Such injunctions issue, as a matter of right, where a violation of constitutional rights has been proved. This court has no discretion to deny injunctive relief to a person who clearly establishes, after a trial on the merits, that he is being denied his constitutional rights. *Cf.* Henry v. Greenville Airport Commission, et al., 284 F.2d 631 (4th Cir. 1960). In addition, the court's decree, where warranted, may provide for the retention of jurisdiction to insure that the injunctive order is carried out in an orderly fashion, Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S. Ct. 753, 99 L.Ed. 1083 (1955); Clemons v. Board of Education of Hillsboro, Ohio, 228 F.2d 853, 859–860 (6th Cir.), cert. den., 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868 (1956), or to allow for the amendment of state rules to conform with the decree, Sostre v. McGinnis, *supra,* 334 F.2d at 912–913. However, the injunction must issue.

Defendants Follette, McGinnis, and Mancusi will be enjoined from returning plaintiff to punitive segregation for charges previously preferred against him. They will be further enjoined from placing plaintiff in punitive segregation or subjecting him to any other punishment as a result of which he loses accrued good time credit or is unable to earn good time credit, without:

1) Giving him, in advance of a hearing, a written copy of any charges made against him, citing the written rule or regulation which it is charged he has violated;

2) Granting him a recorded hearing before a disinterested official where he will be entitled to cross-examine his accusers and to call witnesses on his own behalf;

3) Granting him the right to retain counsel or to appoint a counsel substitute;

4) Giving him, in writing, the decision of the hearing officer in which is briefly set forth the evidence upon which it is based, the reasons for the decision, and the legal basis for the punishment imposed.

Defendants will be required to credit plaintiff with the 124⅓ days of good time credit which he was unable to earn while wrongfully incarcerated in punitive segregation from June 25, 1968 to July 2, 1969.

Defendants will be required to submit proposed rules and regulations governing future disciplinary charges and hearings where the possible punishments include punitive segregation or other loss of, or inability to earn, good time credit. *See* Sostre v. McGinnis, *supra,* 334 F.2d at 912; *cf.* In re Gault, *supra.*

Defendants Follette, McGinnis, and Mancusi will also be permanently enjoined from censoring, refusing to mail, or refusing to give to Sostre: 1) Any communication between Sostre and the following—(a) any court; (b) any public official or agency; (c) any lawyer; (d) his codefendant in the criminal matter pending against him; and, 2) Any letter relating to any legal matter to or

7 N.Y.C.R.R.] Although such action "shall be deemed a judicial function and shall not be reviewable if done according to law," N.Y. Correction Law § 236 (McKinney 1968), it "shall be reviewable by the Commissioner of Correction." 7 N.Y.C.R.R. § 60.4(e). Neither standards nor procedures of review are indicated. Such consideration of loss of good time takes place at the time of consideration of eligibility for parole. Assuming that this last regulation *compels* the commissioner to review with-

holding of reduction of sentence, it can hardly be said that there is, therefore, an "administrative * * * body with an unmistakable mandate" to consider Sostre's complaints. Wright v. McMann, 387 F.2d 519, 528 (2d Cir. 1967), (concurring opinion of Lumbard, C. J.). Furthermore, it is clear that taken in its most benign posture, 7 N.Y.C.R.R. § 60.4(e), does not apply to review of *other* forms of punishment—such as punitive segregation.

from any other inmate of Green Haven who requests the assistance of Sostre in translating that letter into English.

Defendants will also be permanently enjoined from punishing Sostre for sharing with other inmates his law books, law reviews, and other legal materials, and from refusing to permit Sostre to assist any other inmate in any legal matter as long as defendants have not provided any alternative means of legal assistance for such inmates. [Sostre, of course, may not receive compensation in any form for furnishing such assistance or for lending law books or other property. There was no claim here that Sostre received any such compensation.]

The complaint alleged that plaintiff had been subjected to punitive segregation "because of his participation in the black liberation movement and because of his statements concerning the racist and oppressive nature of the prison system, as directed and operated by the defendants and others." (Amended Complaint, para. 19). This court has found that plaintiff was punished because of his political views, which the prison authorities find offensive, under the pretext that Sostre had violated prison rules and regulations. Consequently, defendants Follette, McGinnis, and Mancusi will be enjoined from punishing Sostre for having in his possession political literature and for setting forth his political views orally or in writing, except for violation of reasonable rules approved by the court regulating freedom of speech. Defendants will be required to submit proposed rules and regulations governing the receipt, distribution, discussion and writing of political literature for court approval.

## VIII. *Damages*

The final issue in this case is plaintiff's prayer for $1,200,000 damages.[15] As discussed above, plaintiff's right to recover damages against state officials in their official capacities, who violate rights secured to him by the Fourteenth Amendment, is provided for by 42 U.S.C. § 1983.

The evidence shows that plaintiff was subjected to punitive segregation without due process of law for more than one year under conditions which violate present standards of decency. The court finds that such cruel and unusual punishment over the long period of time involved here resulted in injury to plaintiff as follows: 1) severe physical deprivations, i. e., loss of energy-giving food and loss of exercise, 2) needless degradation, 3) loss of work opportunities of a rehabilitative nature, 4) loss of money which might have been earned by working, 5) loss of schooling and training opportunities, 6) loss of self-improvement through reading books of one's own choice, and 7) great mental anguish.

Therefore, the court awards plaintiff $25.00 per day for every day spent in punitive segregation (372 days), or a total of $9,300 compensatory damages against defendants Follette and McGinnis. "Compensatory damages for deprivation of a federal right are governed by federal standards, as provided by Congress in 42 U.S.C. § 1988, * * *" Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 239, 90 S.Ct. 400, 406, 24 L.Ed.2d 386 (1969); Basista v. Weir, 340 F.2d 74, 87 (3rd Cir. 1965).

The bad faith and malice toward Sostre (based in large part upon political disagreement with him) that motivated Follette to put plaintiff in punitive segregation and, in effect, to "throw the key away," and McGinnis' failure to act after being notified of Sostre's confinement as early as July 1968, are quite reprehensible; an award of exemplary damages is in order. Basista v. Weir, *supra,* 340 F.2d at 87–88; *accord,* Hague v. Committee for Industrial Organization, 101 F.2d 774, 789 (3rd

---

15. Both parties have waived their right to a jury trial in this matter by not requesting a jury trial. Rule 38(d), Fed. R.Civ.P.

Cir. 1939), modified on other grounds, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); Antelope v. George, 211 F.Supp. 657 (D.Idaho 1962); *See also* Comment, Civil Actions for Damages Under the Federal Civil Rights Statutes, 45 Texas L.Rev. 1015 (1967). Otherwise, these malicious acts and acts of studied omission might recur in the future.

The court, therefore, awards the additional sum of $10.00 per day, or a total of $3,720 in punitive damages against defendants Follette and McGinnis.

Additional support for the proposition that damage actions against state officials in their official capacities are maintainable under Section 1983, and for the award made here, may be garnered from those cases in which damages have been actually recovered against state officials so named. Rhoads v. Horvat, 270 F.Supp. 307 (D.Colo.1967) ($5000 compensatory and $2500 punitive damages for 30–45 minute false imprisonment by county sheriff and deputy); Rolfe v. County Board of Education of Lincoln Co., Tenn., 391 F.2d 77 (6th Cir. 1968) ($3,173.60 and $2,563.31 compensatory damages, respectively, and $250 counsel fees each, for two teachers dismissed by superintendent of schools and county board of education); Rackley v. School District No. 5, Orangeburg Co., S. C., 258 F.Supp. 676 (D.S.C.1966) ($4064.61 compensatory damages for dismissal of teacher).

Similar support may be predicated upon those cases naming officials as such, in which the right to damages under Section 1983 has been expressly recognized. Wall v. Stanly County Board of Education, 378 F.2d 275 (4th Cir. 1967) (actual damages ordered awarded for dismissal of teacher); Smith v. Board of Education, 365 F.2d 770 (8th Cir. 1966) (*Id.* teacher); Chambers v. Hendersonville City Board of Education, 364 F.2d 189 (4th Cir. 1966) (*Id.* teacher); Johnson v. Branch, 364 F.2d 177 (4th Cir. 1966), cert. den. 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967) (*Id.* teacher whose contract was not renewed); Williams v. Sumter School District, 255 F.Supp. 397 (D.S.C.1966) (settle order "agreeing on damages, monetary relief, et cetera"); Washington v. Official Court Stenographer, 251 F.Supp. 945 (E.D.Pa.1966) (action by prisoner to compel furnishing of transcript in compliance with previous court orders: "Even if no actual damages are sustained, nominal and punitive damages may be recovered." *Id.* at 947); Marshall v. Sawyer, 301 F.2d 639 (9th Cir. 1962) (action by gambler, charging blacklisting, against governor, gaming board and commission and members thereof, and others: remanded for determination of damage claims; subsequent judgment on merits for defendants aff'd, 365 F.2d 105 (1966).

Then there are those cases in which the right to seek Section 1983 remedies has been upheld. American Federation of State, Co., and Mun. Employees v. Woodward, 406 F.2d 137 (8th Cir. 1969) (action for damages and injunctive relief against City Commissioner who discharged employees for joining labor union); Wright v. McMann, *supra,* (action for $10,000 damages and injunctive relief against Warden of Clinton Prison).

Moreover, there are the suits for damages for deprivation of constitutional rights brought against state officials under the federal question jurisdiction statute, which the Supreme Court held maintainable, and which support the award made here. Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927) (suit for $5000 damages for denial of right to vote in primary election; jurisdiction based on violation of Fourteenth Amendment); Wiley v. Sinkler, 179 U.S. 58, 21 S.Ct. 17, 45 L.Ed. 84 (1900) (suit for $2500 damages for denial of right to vote for members of Congress, based on federal constitutional provision).

█ Finally, if it can be said that Congress has not provided a damage remedy against state officials in their official capacities under Section 1983; and further, that there is no other fed-

eral remedy because Monroe v. Pape, *supra,* left the question open, or because of the Eleventh Amendment, then this court looks to New York's remedy (New York Correction Law § 6–b and New York Court of Claims Act § 8),[16] as provided by 42 U.S.C. § 1988,[17] to fill this deficiency in federal law. Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); Basista v. Weir, *supra*; Pritchard v. Smith, 289 F.2d 153 (8th Cir. 1961); Brazier v. Cherry, 293 F.2d 401 (5th Cir. 1961), cert. den., 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961).

When we look at New York's remedy we find that New York has waived its Eleventh Amendment immunity, if it ever had any, as to Fourteenth Amendment actions, and has specifically provided for suit by state prisoners against correction officials in their official capacities, but has also provided for certain defenses to such suits. The court would borrow here, if necessary, New York's waiver of immunity but not its

defenses. As the Court said in Brazier v. Cherry, *supra:*

Thus § 1988 declares a simple, direct, abbreviated test: what is needed in the particular case under scrutiny to make the civil rights statutes fully effective? The answer to that inquiry is then matched against (a) federal law and if it is found wanting the court must look to (b) state law currently in effect. To whatever extent (b) helps, it is automatically available, not because it is procedure rather than substance, but because Congress says so.

*Id.* at 409.

The Supreme Court has read into Section 1983 actions certain common law immunities and defenses. In Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L. Ed.2d 288 (1967), the Court held that the common law immunity of judges from suits for damages for acts performed in the course of their official duties, applies to Section 1983 actions. It also

---

16. N.Y. Correction Law § 6–b (McKinney 1968) provides:

No civil action shall be brought in any court against the commissioner or a deputy commissioner of correction or an officer or employee of a state prison or reformatory or institution for criminally insane or mentally defective persons in the department, in his personal capacity, for alleged damages because of any act done or failure to perform any act, while discharging his official duties, without leave of judge of a supreme court, first had and obtained. Any such officer or employee in any such action shall not be liable for damages if he shall have acted in good faith, with reasonable care and upon probable cause.

Any just claim for damages against such commissioner, officer or employee for which the state would be legally or equitably liable, shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Court of Claims Act § 8 (McKinney 1963) provides:

The state hereby waives its immunity from liability and action and hereby assumes liability and consents to have the same determined in accordance with the same rules of law as applied to actions in the supreme court against individuals

or corporations, provided the claimant complies with the limitations of this article. Nothing herein contained shall be construed to affect, alter or repeal any provision of the workmen's compensation law.

17. 42 U.S.C. § 1988 provides:
*Proceedings in Vindication of Civil Rights.*
The jurisdiction in civil * * * matters conferred on the district courts by the provisions of this chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil * * * cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, * * *.

held that police officers, although not enjoying the same immunity, are entitled to the common law defense of probable cause and good faith when sued for damages under Section 1983.

The question whether all state officials have complete or partial immunity has been decided by this Circuit. In Jobson v. Henne, 355 F.2d 129 (2d Cir. 1966), the court held that state common law immunities afforded to judges could not, consistently with Section 1983, be extended to the director of a state mental institution or the other officials who actually were responsible for the injury complained of, or who had the power to change the conditions about which the plaintiff complained. The court also disapproved of immunity for subordinate state officials for all discretionary acts. *Id.* at 134, ftn. 11.

The court in Whirl v. Kern, 407 F.2d 781 (5th Cir. 1968), cert. den., 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969) held: "[T]he breadth of a peace officer's privilege in an arrest situation is not necessarily the test of the breadth of a jailer's privilege in the context of a false imprisonment. There is no privilege in a jailer to keep a prisoner in jail beyond the period of his lawful sentence * * * The fact that the jailer is without personal knowledge that the prisoner is held unlawfully does not constitute a defense to an action for false imprisonment." *Id.* at 791. In *Whirl* the Fifth Circuit reversed a jury verdict for the defendant jailer and held that the defense of "good faith" is not available to a prison administrator who detained the prisoner for almost nine months because the prison administrator failed to properly process his release papers.

In Joseph v. Rowlen, 402 F.2d 367 (7th Cir. 1968), the court refused to grant immunity to a peace officer who made an arrest without a warrant and without probable cause.

Even if the defense of "good faith" were available to defendants in this Section 1983 damage action, the court finds that they had none. Sostre was, in fact, subjected to cruel and unusual punishment because he insisted upon exercising his constitutional rights. The multiplicity of charges against him was a pretext for his long punishment. And as set forth above, even if some of the charges found to be false were true, the long punishment for such offenses and the failure to take into account the Supreme Court's decision in Johnson v. Avery, *supra*, demolish any claim of good faith.

Although Follette claims that Sostre was not in solitary confinement but in punitive segregation, he simultaneously claims that he was authorized by New York Correction Law § 140 (McKinney 1968) to confine plaintiff to punitive segregation for the period of time, and under the conditions, which he did. Consequently, says the Warden, "it would be untenable if a state official were forced to pay damages for exercising his duty under a valid state statute." (Reply Brief of Defendants at 40). This statute provides:

*Solitary confinement on short rations.*

If in the opinion of the warden of such prison it shall be deemed necessary, in any case, to inflict unusual punishment in order to produce the entire submission or obedience of any prisoner, it shall be the duty of such warden to confine such prisoner immediately in a cell, upon a short allowance, and to retain him therein until he shall be reduced to submission and obedience. The short allowance of each prisoner so confined shall be prescribed by the physician, whose duty it shall be to visit such prisoner and examine daily into the state of his health until the prisoner be released from solitary confinement and returned to his labor.

 There is nothing in this statute which authorized Follette to punish plaintiff for exercising his constitu-

tional rights.[18] Even defendants do not claim that under this statute the Warden could put a prisoner into solitary confinement or punitive segregation for something which he allegedly did but which was not in fact done, or which was a violation of a constitutionally invalid rule. In order for this statute to remain constitutional, it must be construed to authorize solitary confinement or punitive segregation for no more than 15 days for serious infractions of the rules and after hearing and determination in accordance with the minimum procedural due process requirements set forth above. The American Correctional Association, Manual of Correctional Standards 414–415 (3rd ed. 1966).

The court will retain jurisdiction of this case to give defendants Follette, McGinnis, and Mancusi an opportunity to submit, for approval by this court, the proposed rules required by this opinion. Such proposal shall be submitted on or before the expiration of 90 days from the filing of the court's order in accordance with this opinion. Plaintiff shall have 30 days, thereafter, to file any objections thereto, after which the court will determine whether any further hearing is required before final approval.

---

18. Plaintiff did not seek in this action to enjoin the enforcement of this statute on the ground of its repugnance to the Federal Constitution.